FILED

12/13/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 16-0328

OP 16-0328

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 310

DERRICK EARL STEILMAN,

        Petitioner,

   v.

REGINALD MICHAEL, Director, Montana
Department of Corrections,
TIMOTHY CHARLES FOX, Montana Attorney General,

        Respondents.

| | |
|---|---|
| ORIGINAL PROCEEDING: | Petition for Writ of Habeas Corpus<br>District Court of the Second Judicial District,<br>In and for the County of Silver Bow, Cause No. DC 98-131<br>Honorable James E. Purcell, Presiding Judge |

COUNSEL OF RECORD:

        For Petitioner:

                Colin M. Stephens (argued), Nick K. Brooke (argued), Smith & Stephens,
                P.C., Missoula, Montana

        For Respondents:

                Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss (argued),
                Assistant Attorney General, Helena, Montana

                Colleen Ambrose, Chief Legal Counsel, Montana Department of
                Corrections, Helena, Montana

                          Argued and Submitted: May 17, 2017
                                Decided: December 13, 2017

Filed:

                _____
                            Clerk

**OPINION AND ORDER**

Justice James Jeremiah Shea delivered the Opinion and Order of the Court.

¶1 Derrick Earl Steilman petitions for a writ of habeas corpus. Relying on *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), and *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718 (2016), Steilman argues that his sentence of 110 years imprisonment, without the possibility of parole, for deliberate homicide with the use of a weapon, violates his Eighth Amendment rights because Steilman committed the offense when he was seventeen years old and the sentencing court failed to consider the special circumstances of his youth.

¶2 We address the following issues:

> *Issue One: Whether* Miller *and* Montgomery *apply to Montana's discretionary sentencing scheme.*
>
> *Issue Two: Whether Steilman's sentence qualifies as a de facto life sentence to which* Miller *and* Montgomery *apply.*

¶3 We hold that *Miller* and *Montgomery* apply to discretionary sentences in Montana. Regarding the applicability to de facto life sentences in Montana, the dispositive issue in this case is whether the unique circumstances of Steilman's Montana sentence, when viewed in light of his eligibility for day-for-day good time credit and the concurrent sentence he is presently serving in Washington, qualifies as a de facto life sentence to which *Miller's* substantive rule applies. We conclude that Steilman's sentence does not qualify as a de facto life sentence, and therefore we do not reach the merits of whether the District Court properly considered the special circumstances of Steilman's youth in this case as required by *Miller*. We deny Steilman's petition.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4 On the night of September 17–18, 1996, Steilman and his accomplice, Steven Francis, made a pact to kill someone as a show of trust before pursuing a criminal enterprise together that included a planned bank robbery. Steilman and Francis randomly crossed paths with Paul Bischke. Steilman and Francis demanded Bischke's money, then struck him at least four times in the head, face, and arms with a crow bar, killing him. At the time he committed this murder, Steilman was 17 years and 323 days old, six weeks before his eighteenth birthday.

¶5 Steilman then moved to Tacoma, Washington, where nearly two years later, on or about September 10, 1998, he killed Jack Davis by beating Davis with a baseball bat. Within a week, Steilman and his then-girlfriend Colleen Wood were arrested in Butte in connection with the Washington homicide. Wood reported that Steilman took her to Davis's apartment to show her Davis's body. Another former girlfriend of Steilman's told law enforcement that he admitted to killing someone and acted "as if it was nothing," but she waited to contact law enforcement because Steilman threatened to kill her. The presentence investigation report provided Steilman dropped out of school before the tenth grade in large part due to drug and alcohol abuse, which started when he was thirteen. The report also provided that Steilman surrounded himself with "friends and acquaintances [who] were almost all using drugs and alcohol and living a criminal lifestyle to support their addictions."

¶6 On October 5, 1998, the State charged Steilman with deliberate homicide. The prosecution commenced in Youth Court because Steilman was under eighteen when he

committed the first murder. The State moved to transfer Steilman's case to District Court. The Youth Court found: Steilman was seventeen years old when he committed the offense; probable cause existed; the delinquent act constituted deliberate homicide; the gravity of the offense and protection of the community required treatment beyond that afforded by juvenile facilities; the offense was committed in an aggressive and violent manner; and § 41-5-206(3) (1995), MCA, required transfer to the District Court.

¶7 Following the transfer to District Court, Steilman was returned to Washington for prosecution of Davis's murder. He pled guilty to first degree murder and was sentenced to 260 months of incarceration plus 24 months for the use of a weapon, totaling 23 years, 8 months. As an inmate of the State of Washington, Steilman was returned on a detainer order to be prosecuted in Montana for Bischke's murder.

¶8 On October 1, 1999, Steilman pled guilty to deliberate homicide. On October 15, 1999, the District Court sentenced Steilman to the Montana State Prison for 100 years for deliberate homicide and 10 years for the use of a weapon, to run consecutively. The District Court reasoned that "the gravity and random nature of the murder . . . [, Steilman's] commission of another homicide, the punishment permitted by law and the possibility, or lack thereof, of rehabilitation" justified the 110-year sentence. The District Court also ordered Steilman ineligible for parole, remarking the "commission of a senseless, brutal, random homicide demonstrates that [Steilman] is not a suitable candidate for parole or other supervised release."

¶9 Steilman's Montana sentence is eligible for day-for-day good time allowance, which, contingent upon his behavior in prison, could make him eligible for release in 55

years. Section 53-30-105, MCA (1995); *see Wilcock v. State*, No. OP 11-0442, 362 Mont. 544, 272 P.3d 125 (table) (Sept. 13, 2011). Also, the District Court ordered Steilman's 110-year prison term to run concurrent with his 23 years, 8 months Washington sentence. Under Washington law, Steilman is required to serve at least two-thirds of his sentence before he would be eligible for community release.

**DISCUSSION**

¶10 Section 46-22-101, MCA, provides "every person imprisoned or otherwise restrained of liberty within this state may prosecute a writ of habeas corpus to inquire into the cause of imprisonment or restraint and, if illegal, to be delivered from the imprisonment or restraint." Article II, Section 19 of the Montana Constitution guarantees the writ of habeas corpus shall never be suspended. The writ of habeas corpus is available to challenge the legality of the sentence; however, it is not available to attack the validity of the conviction or sentence of a person who has been adjudged guilty of an offense in a court of record and has exhausted the remedy of appeal. Sections 46-21-101(1), -22-101(2), MCA; *Rudolph v. Day*, 273 Mont. 309, 311, 902 P.2d 1007, 1008 (1995). The exception for filing habeas petitions to challenge a facially invalid sentence is generally limited to invalidity that "stems from a rule created after time limits for directly appealing or petitioning for postconviction relief have expired." *Beach v. State*, 2015 MT 118, ¶ 6, 379 Mont. 74, 348 P.3d 629 (citing *Lott v. State*, 2006 MT 279, ¶ 22, 334 Mont. 270, 150 P.3d 337). A petitioner who successfully challenges a sentence by way of habeas corpus, but not the underlying conviction, is not entitled to be released, but only to be resentenced. *Lott*, ¶ 23. If the illegal portion of a sentence "affects the entire sentence"

5

and we are unable to discern what the district court would have done if it had properly applied the law, we remand for resentencing. *State v. Heath*, 2005 MT 280, ¶ 7, 329 Mont. 226, 123 P.2d 228.

¶11  *Issue One: Whether* Miller *and* Montgomery *apply to Montana's discretionary sentencing scheme.*

¶12  The State argues that Steilman's sentence is not facially invalid and habeas relief is not available because the sentencing court had the constitutional authority to impose the sentence. The State contends that *Miller's* rules only apply to sentencing schemes mandating life without parole for juvenile offenders, and that the "mandatory sentencing rule has no application in Montana." *See Beach*, ¶ 36. The State further contends that *Miller* merely requires the sentencing court to follow a certain process before imposing a life without parole sentence on a juvenile, and does not "foreclose a sentencer's ability to make that judgment in homicide cases." *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469. According to the State, under *Miller* a sentencing court retains the constitutional authority to sentence a juvenile to life without parole; therefore, as a matter of law, such a sentence cannot be facially invalid under *Lott*. *See Beach*, ¶ 38; *Lott*, ¶ 22. We disagree, and are satisfied that Steilman sufficiently calls into question the facial validity of his sentence because *Montgomery* announced that *Miller* applies retroactively and effectively overruled our holding in *Beach*. *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734.

¶13  The Eighth Amendment to the United States Constitution and Article II, Section 22 of the Montana Constitution provide: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The U.S. Supreme Court

6

dictates that courts must interpret the Eighth Amendment "according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design" and refer to "'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 560–61, 125 S. Ct. 1183, 1190 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S. Ct. 590, 598 (1958) (plurality opinion)). The Eighth Amendment prohibition against cruel and unusual punishment "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to the offense.'" *Roper*, 543 U.S. at 560, 125 S. Ct. at 1190 (quoting *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S. Ct. 2242 (2002)). "While in practice the concept of proportionality does not affect most sentences, proportionality bears on the harshest types of punishments when an Eighth Amendment challenge is raised." *Beach*, ¶ 8 (citing *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179 (2003)) (internal citations omitted).

¶14    Through a series of decisions over the last dozen years, the U.S. Supreme Court has made clear that "children are constitutionally different from adults for purposes of sentencing" under the Eighth Amendment. *See Montgomery*, ___ U.S. ___, 136 S. Ct. at 732–733 (holding that *Miller*'s procedural requirements to consider characteristics of youth when sentencing juvenile offenders provides a substantive rule that applies retroactively); *Miller*, 567 U.S. at 470–71, 132 S. Ct. at 2463–64 (holding the Eighth Amendment forbids a sentencing scheme that mandates life without the possibility of parole for juvenile offenders); *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 2026 (2010) (holding the

7

Eighth Amendment categorically forbids sentences of life without parole for juveniles convicted of nonhomicide offenses); *Roper*, 543 U.S. at 575, 125 S. Ct. at 1198 (holding capital punishment unconstitutional for juvenile offenders).

¶15    The U.S. Supreme Court identified three primary differences between adult and juvenile offenders:

> First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable to negative influences and outside pressures," including from their family and peers; they have limited "control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievable depravity."

*Montgomery*, ___ U.S. at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464) (alterations, citations, and some internal quotation marks omitted). "These differences render suspect any conclusion that a juvenile falls among the worst offenders." *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195. The Court admitted the difficulty, even for expert psychologists, "to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197. The Court acknowledged the inherent "differences [that] result from children's 'diminished culpability and greater prospects for reform,'" and that "'the distinctive attributes of youth diminish the penological justifications' for imposing life without parole on juvenile offenders." *Montgomery*, ___ U.S. ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 461, 132 S. Ct. at 2465). The Court reiterated that "youth matters in determining the

8

appropriateness of a lifetime of incarceration without the possibility of parole." *Miller*, 567 U.S. at 473, 132 S. Ct. at 2465. In so doing, *Miller* barred life without parole for all but the rarest juvenile offenders whose crimes reflect permanent incorrigibility. *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734.

¶16 The *Miller* Court outlined five factors of mandatory sentencing schemes that "prevent the sentencer from considering youth and from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Miller*, 567 U.S. at 461–62, 132 S. Ct. at 2458.

> Mandatory life without parole for a juvenile [1] precludes consideration of his chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences. [2] It prevents taking into account the family and home environment that surrounds him— and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. [3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. [4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And [5] finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468. Even though the *Miller* Court did not categorically bar sentences of life without parole for juveniles convicted of a homicide offense, the Court required sentencing judges "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469.

9

¶17 Steilman argues that the aspect that is cruel and unusual for juvenile offenders is the sentence of life without parole itself, not whether the scheme under which the sentence is imposed is mandatory. We agree. Discussing its rationale for treating juvenile offenders differently from adult offenders, the U.S. Supreme Court explained that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 726 (quoting *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469). The Court further noted, "*Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734 (quoting *Miller,* 567 U.S. at 472, 132 S. Ct. at 2465). In the same vein, the Seventh Circuit Court of Appeals appropriately reasoned: "The relevance to sentencing of 'children are different' also cannot in logic depend on whether the legislature has made the life sentence discretionary or mandatory; even discretionary life sentences must be guided by consideration of age-relevant factors." *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016). We conclude that *Miller's* substantive rule requires Montana's sentencing judges to adequately consider the mitigating characteristics of youth set forth in the *Miller* factors when sentencing juvenile offenders to life without the possibility of parole, irrespective of whether the life sentence was discretionary.

¶18    *Issue Two: Whether Steilman's sentence qualifies as a de facto life sentence to which* Miller *applies.*

¶19    The State argues that because Montana law provides a distinction between sentences of life imprisonment, term-of-years, and death, a term-of-years sentence cannot become a de facto life sentence and equate to a de jure life imprisonment under Montana law. *See* § 45-5-102(2), MCA. The State contends Steilman's term of 110 years as a sentence is not the same as a life imprisonment sentence, and *Miller* only applies to life imprisonment. The State further contends no standard exists to determine how long a term-of-years must be before it becomes the equivalent of life imprisonment, and any term-of-years could be equivalent to life without parole if the offender dies while incarcerated. We disagree.

¶20    The same principles that make *Miller* applicable to Montana's discretionary scheme similarly apply to a term-of-years sentence that is the practical equivalent of life without parole. A strict application of the State's argument would mean that a sentence that inarguably would not allow for the offender to ever be released could not be considered a life sentence so long as the sentence is expressed in years. Logically, the requirement to consider how "children are different" cannot be limited to de jure life sentences when a lengthy sentence denominated in a number of years will effectively result in the juvenile offender's imprisonment for life. *See McKinley*, 809 F.3d at 911; *State v. Zuber*, 152 A.3d 197 (N.J. 2017); *People v. Nieto*, 52 N.E.3d 442 (Ill. App. Ct. 2016); *Kelly v. Brown*, 851 F.3d 686 (7th Cir. 2017); *State v. Ramos*, 387 P.3d 650 (Wash. 2017); *State v. Cardeilhac*, 876 N.W.2d 876 (Neb. 2016); *People v. Cervantes*, 9 Cal. App. 5th 569 (Cal. Ct. App. 2017); *Hayden v. Keller*, 134 F.Supp.3d 1000 (E.D.N.C. 2015).

¶21　In *Graham*, upon which the *Miller* Court relied heavily, the Court reasoned that sentencing a juvenile non-homicide offender to life without parole violates the Eighth Amendment's rule against disproportionate sentences because it denies the juvenile offender a chance to demonstrate growth and maturity. *Graham*, 560 U.S. at 73, 130 S. Ct. at 2029. The *Graham* Court did not focus on the precise sentence meted out, nor did it require the state to "guarantee the offender eventual release, but if [the state] imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." *Graham*, 560 U.S. at 82, 130 S. Ct. at 2034. Consonantly, the *Montgomery* Court dictated that children, who are constitutionally different from adults in their level of culpability, must be given the opportunity to show their crime did not reflect irreparable corruption, and if redeemable, their hope of release must be restored. *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736–37. As such, the rule in *Montgomery* "draws 'a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption' and allows for the possibility 'that life without parole could be a proportionate sentence only for the latter kind of juvenile offender.'" *Tatum v. Arizona*, ___ U.S. ___, ___, 137 S. Ct. 11, 12 (2016) (Sotomayor, J., concurring) (quoting *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734). *Montgomery* and *Graham* illustrate the U.S. Supreme Court's inexorable evolution recognizing that all but the rarest juvenile offenders be given an opportunity for redemption and a hope of release, which a sentence of life without parole cannot provide. As it pertains to the specific sentence imposed on Steilman, however, our analysis cannot end here.

¶22 The dispositive question remaining is whether the sentence imposed on Steilman does, in fact, constitute a de facto life sentence that triggers the Eighth Amendment protections set forth in *Montgomery* and *Miller*. We begin with the practical application of Steilman's sentence. As the State points out, because Steilman is eligible for day-for-day good time credit, his 110-year sentence allows for his release after serving only 55 years, contingent upon his behavior in prison. Section 53-30-105, MCA (1995) (repealed 1997). Let us assume, for the sake of argument, that a sentence imposed upon a twenty-one year old man, which allows for the possibility of release in 55 years, constitutes a de facto life sentence. We nevertheless cannot ignore the reality that Steilman's Montana sentence was imposed to run concurrent with the Washington sentence he was already serving for the murder he committed as an adult in Washington, thus giving Steilman credit towards his Montana sentence for time served on a wholly unrelated murder in Washington.

¶23 The Eighth Amendment prohibition against cruel and unusual punishment "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to the offense.'" *Roper*, 543 U.S. at 560, 125 S. Ct. at 1190. After factoring in both the day-for-day good time credit to which Steilman is eligible, and the credit he gets towards his Montana sentence while serving his concurrent sentence in Washington, Steilman could potentially serve as little as 31.33 years exclusively attributed towards Bischke's murder. Had the Montana District Court imposed a sentence that allowed for the possibility of Steilman's release after serving as little as 31.33 years, but ordered the sentence to run *consecutive* to his Washington sentence, Steilman would be hard pressed

13

to argue that such a sentence was disproportionate to the horrific crime he committed. In that circumstance, such a sentence would simply reflect a proportionate sentence independently imposed for a crime independently committed. And yet this is precisely the practical effect of the sentence Steilman actually received. Steilman was not entitled to a concurrent sentence in this case. Nevertheless, the District Court, in its discretion, elected to run his Montana sentence concurrent with his Washington sentence, inuring considerably to Steilman's benefit. If we were to ignore the practical effect of Steilman's sentence, we would be allowing him to reap that benefit while disregarding it for purposes of assessing the proportionality of his Montana sentence. Determining whether a sentence is cruel and unusual does not require us to ignore reality.

## CONCLUSION

¶24 The combination of the good-time credit to which Steilman is eligible and the amount of his sentence that will be discharged while serving a sentence on a wholly unrelated crime leads us to conclude that Steilman's sentence does not trigger Eighth Amendment protections under *Montgomery*, *Miller*, and *Graham*. Therefore, we do not reach the question of whether the District Court failed to adequately consider Steilman's youth under *Miller* and *Montgomery* when sentencing him.

## ORDER

¶25 The petition for writ of habeas corpus is DENIED.

DATED this 13th day of December, 2017.

/S/ JAMES JEREMIAH SHEA

14

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JIM RICE

Justice Michael E Wheat, dissenting.

¶26    I concur with the Court's determination that *Miller* and *Montgomery* apply to Montana's discretionary sentencing scheme and that a lengthy term-of-years sentence could invoke *Miller* if the sentence is the practical equivalent of life without parole. However, I respectfully dissent from the majority's decision that Steilman's sentence does not qualify as a life sentence without parole sufficient to implicate *Miller*.  In my opinion, Steilman's sentence invokes *Miller*; therefore, I would grant Steilman's petition for a writ of habeas corpus and vacate the parole restriction.

¶27    The underlying principles of the United States Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), and *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718 (2016), are that "children are constitutionally different from adults for purposes of sentencing" and "have diminished culpability and greater prospects for reform."  *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464.  The "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."  *Miller*, 567 U.S. at 474, 132 S. Ct. at 2466.  *Montgomery* echoed the same concerns:  "In light of what this Court has said in *Roper, Graham*, and *Miller* about how children are constitutionally different from adults in their level of culpability, . . . prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be

15

restored." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736-37. Although the majority reiterates many of these principles, it nevertheless rejects their application where a seventeen-year-old was sentenced to the practical equivalent of life without parole. Consequently, Steilman was never and will never be given an opportunity to show that his crime did not reflect irreparable corruption. Such result is contrary to the principles set forth in *Miller* and *Montgomery*.

¶28 The majority erred in concluding that a seventeen-year-old sentenced to 110 years without the possibility of parole, with a conditional minimum sentence of 55 years, is outside the scope of *Miller*. *Miller's* command that a sentencing judge "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," applies with equal strength to a sentence that is the practical equivalent of life without parole. *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469. Therefore, states have held that lengthy term-of-years sentences imposed on juveniles, similar to Steilman's sentence in this case, are sufficient to trigger the protections of *Miller* under the United States and state Constitutions. *See Casiano v. Comm'r of Corr.*, 317 Conn. 52, 115 A.3d 1031, 1044 (Conn. 2015), *cert. denied*, *Semple v. Casiano*, ___ U.S. ___, 136 S. Ct. 1364 (2016) (50-year sentence without possibility of parole is subject to *Miller*); *Iowa v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (minimum sentence of 52.5 years imprisonment invokes *Miller*); *New Jersey v. Zuber*, 227 N.J. 422, 452, 152 A.3d 197, 215 (N.J. 2017) (110-year sentence with 55 years of parole ineligibility implicates *Miller*); *Bear Cloud v. Wyoming*, 2014 WY 113, 334 P.3d 132, 141-42 (Wyo. 2014) (holding that an

aggregate sentence of more than 45 years was de facto life without parole and was barred by *Miller*).

¶29 Here, Steilman's sentence should trigger *Miller* and *Montgomery* protections. The District Court sentenced Steilman to the maximum number of years pursuant to § 45-5-201, MCA (1995), and § 46-18-221, MCA (1995), which is the practical equivalent of life without parole. Thus, Steilman's multiple term-of-years sentence, in all likelihood, will keep him in jail for the majority of his life without the possibility of release until he is well into his seventies.

¶30 Additionally, the majority incorrectly focuses on the fact that Steilman's sentence is subject to day-to-day credits to conclude that his sentence does not implicate *Miller*. Opinion, ¶ 22. However, a conditional release based on day-to-day credits is not determined by a district court, but rather is determined by the Montana Department of Corrections. This Court should consider the actual sentence imposed on Steilman, not a sentence that is subjectively determined by an entity other than the District Court. And despite the majority's conclusion, there is no guarantee that Steilman will be released after 55 years. Therefore, although Steilman's sentence may be subject to day-to-day credit, it should not negate the fact that the sentencing judge sentenced Steilman to the practical equivalent of life without parole: 110 years without the possibility of parole. Thus, I would conclude that Steilman's sentence would constitute a de facto life sentence and habeas corpus relief is appropriate.

¶31 Because Steilman's sentence is subject to *Miller* and *Montgomery*, I would strike the parole restriction. The United States Supreme Court emphasized that by giving *Miller*

17

retroactive effect "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. Such remedy is appropriate here. It would allow Steilman to be considered for parole, which "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. Further, allowing Steilman parole eligibility would permit the parole board to evaluate whether Steilman "demonstrate[s] the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. Thus, striking the parole restriction would provide Steilman with the meaningful opportunity for release that *Miller* and *Montgomery* mandate of juvenile homicide offenders, provided he does not reflect irreparable corruption.

¶32 Accordingly, I would amend Steilman's sentence by striking the parole restriction because his sentence of 110 years without the possibility of parole implicates *Miller*. Then, the parole board could properly consider Steilman's "youth and attendant characteristics" at the time of his crime and his development and behavior during incarceration. Conversely, Steilman could be re-sentenced or given a *Miller* hearing to ensure that his sentence does not upset the concerns enunciated by the United States Supreme Court regarding the culpability of juvenile offenders and these offenders' potential for growth and maturity.

¶33 For these reasons, I dissent from the Court's denial of Steilman's petition.

/S/ MICHAEL E WHEAT

Justice Dirk Sandefer joins in the Dissent of Justice Michael E Wheat.

/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon, dissenting.

¶34 In *Beach*, this Court considered the U.S. Supreme Court's pronouncement in *Miller*, that "a sentencer follow a *certain process*--considering an offender's youth and attendant characteristics--before imposing a particular penalty." *Miller*, 567 U.S. at 483, 132 S. Ct. at 2471 (emphasis added). The Court was asked to decide whether *Miller* applied to a state collateral proceeding thus requiring Beach to be resentenced. I specially concurred in *Beach*, concluding Montana's individualized and discretionary sentencing scheme already required a sentencing court to consider a defendant's individual needs, characteristics, family environment, and prospects for rehabilitation—including age. In my opinion, it was significant that *Miller* had been decided within the context of a mandatory statutory sentencing scheme, which did not allow for imposition of a sentence less than life without parole for first degree murder, regardless of the age of the offender at the time the crime was committed. I also concluded that pursuant to Montana's habeas corpus statute, § 46-22-101(2), MCA, and our holding in *Lott*, Beach was precluded from attacking his facially valid conviction.

19

¶35 Following this Court's decision in *Beach*, the U.S. Supreme Court decided *Montgomery*. In my opinion, *Montgomery* does not simply decide whether a "certain process" required by *Miller* is to be applied retroactively, *Montgomery* actually rewrites and expands the pronouncements made in *Miller*. In *Montgomery*, the Court stated that *Miller* "rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734 (internal quotations and citation omitted). The *Montgomery* Court described its holding in *Miller* as barring sentences of life without parole "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734. The *Montgomery* Court explained, "[t]he only difference between *Roper* and *Graham*, on the one hand, and *Miller*, on the other, is that *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734. The *Montgomery* Court held that "*Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 472, 132 S. Ct. at 2465).

¶36 The difficulty presented in the instant proceedings is that the attributions of the *Montgomery* Court to its *Miller* decision do not appear in *Miller*. In fact, *Miller* stated: "Our decision does not categorically bar a penalty for a class of offenders or type of crime--as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a

20

sentencer *follow a certain process*--considering an offender's youth and attendant characteristics--before imposing a particular penalty." *Miller*, 567 U.S. at 483, 132 S. Ct. at 2471 (emphasis added). Throughout *Miller*, the constitutional error focused on the mandatory nature of the sentence imposed. Thus, *Miller* held that *mandatory* life without parole for juvenile homicide offenders violated the Eighth Amendment's prohibition on "cruel and unusual punishments." *Miller*, 567 U.S. at 465, 132 S. Ct. at 2460. "Before *Miller*, *every* juvenile convicted of a homicide in Alabama was sentenced to life without possibility of parole." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734 (emphasis added). As *Miller* required that a sentencing court consider a youth offender's age, but did not expressly bar life without parole for all juveniles, *Miller*'s application appeared to be limited to when a statutory sentencing scheme allowed discretion to impose a sentence less than life without parole. In the wake of *Miller*, there has been considerable question across the country about whether it set forth a substantive or procedural rule, whether it applied to discretionary sentencing schemes, and whether its pronouncements were to be applied retroactively. Courts across the country reached different conclusions as to what *Miller* meant and required.

¶37    Whether characterized as a clarification or a rewrite of *Miller*, *Montgomery* now establishes that "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 479, 132 S. Ct. at 2469). "A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to

21

*separate* those juveniles who may be sentenced to life without parole from those who may not" and, therefore, give effect to "*Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at 465, 132 S. Ct. at 2460) (emphasis added). Thus, *Montgomery* held that *Miller* rendered life without parole an "*unconstitutional penalty for . . . the vast majority of juvenile offenders*" because most of their crimes reflect the transient immaturity of youth. *Montgomery*, ___ U.S. at ___, 132 S. Ct. at 735 (citations omitted and emphasis added). *Montgomery* concluded that *Miller* had "announced a [new] substantive rule of constitutional law" that had retroactive application. *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734.

¶38    Following *Montgomery,* the U.S. Supreme Court has issued orders vacating and remanding five Arizona state sentences of life without parole for crimes the offenders committed before they turned eighteen. *See Tatum*, ___ U.S. ___, 137 S. Ct. 11. Pursuant to *Miller,* Arizona has expressly considered the offender's youth as a mitigating factor, but still imposed life without parole based on the nature of the offense and the offender. Significantly, the sentences followed the Arizona Legislature's enactment of Ariz. Rev. Stat. § 13-716 in 2014, which provided discretion to the sentencing court to allow the possibility of release for a juvenile sentenced to life imprisonment, after serving a minimum number of calendar years. *See Arizona v. Vera*, 334 P.3d 754, 756-58 (Arizona 2014). Based on Ariz. Rev. Stat. § 13-716, the sentences deemed unconstitutional in *Tatum* were imposed pursuant to a discretionary sentencing scheme. Although the U.S. Supreme Court in *Tatum* did not address the case on its merits, the orders are consistent with

22

*Montgomery*'s holding that unless a juvenile is a member of the exceptional and uncommon class of offenders whose crimes reflect irreparable corruption, a sentence of life without parole is unconstitutionally disproportionate under the Eighth Amendment.

¶39    *Montgomery* is also significant in that it mandated, "for the first time," that "[w]here state collateral review proceedings permit prisoners to challenge the lawfulness of their confinement, States cannot refuse to give retroactive effect to a substantive constitutional right that determines the outcome of that challenge." *Montgomery*, ___ U.S. at ____, 136 S. Ct. at 731-32.  The *Montgomery* Court determined that, under the Supremacy Clause of the United States Constitution, state collateral review courts must give retroactive effect to new substantive rules of constitutional law.  *Montgomery*, ___ U.S. at ____, 136 S. Ct. at 731.  Accordingly, a state's "collateral review procedures are open to claims that a decision of [the U.S. Supreme Court] has rendered certain sentences illegal, as a substantive matter, under the Eighth Amendment." *Montgomery*, ___ U.S. at ____, 136 S. Ct. at 732 (citation omitted).

¶40    This Court is bound by *Montgomery* and its "clarification" of *Miller*.  *Miller* identifies inherent problems when a sentencing court lacks discretion in mandatory sentencing schemes; sets forth factors highlighting the differences between youth and adults (this Court refers to five factors which must be considered, Opinion, ¶¶ 16-17); and enunciates a requirement that the age of the juvenile offender be adequately considered. *Montgomery*, however, sets forth a new substantive constitutional rule more sweeping than this Court recognizes; *Montgomery* categorically declares that the imposition of life without parole upon a juvenile offender is unconstitutional, carving out only a small

23

exception for those rare occasions when irreparable corruption has been demonstrated. That the unconstitutional sentence may have been imposed pursuant to a discretionary sentencing scheme is, therefore, of no consequence. *Montgomery* and *Miller* stand on equal footing with *Roper* and *Graham* in establishing that children are constitutionally different from adults in their level of culpability and in the way they may be constitutionally sentenced. However, *Montgomery* requires that evidence of "irreparable corruption" or "permanent incorrigibility" be demonstrated, not just that the sentencing court considered and addressed various factors of youth. *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 734. Montana's trial courts, as well as Montana's Legislature, should be so advised. "We leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 735 (citation and alterations omitted). "That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole." *Montgomery*, ___ U.S. at ____, 136 S. Ct. at 735.

¶41 Finally, courts tasked with resentencing must decide—in many cases decades after the sentence imposed became final—whether, at the time of commission of the offense, the offender fit within the class of juveniles who were irreparably corrupt. *Montgomery* has suggested an answer to this problem as well. "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. See, *e.g.*, Wyo. Stat. Ann. §6-10-301(c) (2013) (juvenile homicide offenders eligible for parole after 25 years)." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. In my view, the no parole designation in *Montgomery* was the sentencing aspect most

24

troubling for the U.S. Supreme Court because parole ineligibility "condemned [the youthful offender] to die in prison." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. "Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. The Court in *Montgomery* was suggesting a legislative solution for states with mandatory sentencing schemes, in light of its concern that "[g]iving *Miller* retroactive effect . . . not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received *mandatory* life without parole." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736 (emphasis added).

¶42 Based upon *Montgomery*, the suggested remedy to states with mandatory sentencing schemes of allowing for parole, together with the prohibition of parole ineligibility in all but the rarest cases, I would conclude that any distinction between Steilman's sentence for a term of 110 years, without possibility of parole, and life imprisonment, without possibility of parole, is a distinction without a difference. Further, to conclude, as the Court does, that the availability of good time credit is a distinguishing aspect for purposes of sentencing a youth, is likewise inconsistent with the principles set forth in *Montgomery*. Opinion, ¶¶ 22-23. *Montgomery* never acknowledged the availability of good time credit as restoring "hope [to the offender] for some years of life outside prison walls . . . ," *Montgomery*, ___ U.S. at ___, 137 S. Ct. at 736, although doubtless the opportunity to accumulate good time credit was available to every offender whose sentence *Tatum* vacated. In a similar vein, this Court attempts to distinguish Steilman's sentence on the

25

basis that it was imposed concurrently to his Washington sentence. Opinion, ¶¶ 22-23. However, imposing a concurrent sentence does nothing to reduce the length of Steilman's Montana sentence, which remains 110 years regardless of its concurrent nature. More important, however, is Steilman's parole ineligibility for 110 years, which was the most troublesome aspect for the U.S. Supreme Court in *Miller* and *Montgomery*. At the time the sentence was imposed, Steilman was left with no hope of time outside prison. Accordingly, to distinguish Steilman's sentence on either basis fails to recognize the U.S. Supreme Court's direction that youth are constitutionally different from adults. A sentencer is required to consider "how children are different, and how those differences counsel against *irrevocably* sentencing them to a lifetime in prison." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469) (emphasis added).

¶43 Lastly, I would be remiss if I failed to comment on the hardship to a victim's family in having to revisit the tragic circumstances of a loved one's death. Principles of finality of judgments are deeply rooted in this country's jurisprudence and should be honored. Deference to the judgment of the sentencing judge, who is the judicial officer most attuned to the circumstances of the case, is equally well entrenched and should similarly be honored. I am, nonetheless, bound by U.S. Supreme Court precedent and obligated to apply it when the circumstances of the case dictate. Here, I can reach but one conclusion— that *Montgomery* holds a sentence for a youth offender of 110 years without parole is unconstitutionally disproportionate when there is no finding supported by evidence that the youth is irreparably corrupted. The circumstances could support a conclusion that Steilman was irreparably corrupted when he committed the homicide. Steilman was six weeks shy

26

of his eighteenth birthday, had committed another homicide in Washington, and was living an adult lifestyle. The murder was brutal, savage, and senseless. Thus, Steilman hardly appears entitled to "*Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, ___ U.S. at ___, 136 S. Ct. at 736. That determination, however, must be made by the trial court.

¶44 I would grant the petition for writ of habeas corpus on the basis that *Montgomery* and *Miller* established a new substantive rule that is applicable in state collateral proceedings. In contrast to Justices Wheat and Sandefur, however, I would remand for resentencing so that the District Court is free to impose the original sentence, provided the *Miller* and *Montgomery* requirements are met. I do not agree that this Court should merely strike Steilman's parole restriction as suggested by the *Montgomery* Court; particular circumstances of a case and the reasons for imposing a sentence should be considered and determined by the trial court, with this Court subsequently reviewing those decisions and record. Based on statements from the victim's family and other documents in the record, it is clear that parole ineligibility was a significant factor in Steilman's sentence. It may be, however, that the victim's family, following discussion with the prosecutor, would prefer to ask the District Court to reimpose his original sentence, none of which we can assess by merely striking the parole restriction. Accordingly, I would remand these proceedings to the District Court for resentencing consistent with *Miller* and *Montgomery*.

¶45 While I agree with much of the analysis set forth by the Court in Issue One, it is my belief that the Court fails to adequately recognize the impact of *Montgomery* and the findings and conclusions which must be made by the sentencing court. I dissent from the

27

Court's decision in Issue Two, that a term of 110 years without parole is different from a sentence of life imprisonment without parole. Such a conclusion ignores the primary concern in *Montgomery*—that a youth offender not be "condemned to die in prison" without an "opportunity to show [his or her] crime did not reflect irreparable corruption; and, if it did not, [his or her] hope for some years of life outside prison walls must be restored." *Montgomery*, ___ U.S. at ___, 137 S. Ct. at 736-37.

¶46    I dissent.

/S/ LAURIE McKINNON