**AFFIRMED and Opinion Filed March 1, 2021**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-20-00920-CV**

**IN THE MATTER OF J.R., A JUVENILE**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JD-20-00313-X**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Reichek, and Garcia
Opinion by Justice Reichek

This is an accelerated appeal from the juvenile court's order waiving jurisdiction and transferring J.R.'s case to criminal district court. In two issues, J.R. argues (1) the transfer order lacks specificity because it failed to include evidence of mitigating factors and (2) the evidence is factually insufficient to support that J.R. was sufficiently sophisticated and mature to certify him as an adult. For the reasons set out below, we overrule both issues and affirm the trial court's order.

## BACKGROUND

J.R., who was sixteen years old at the time of the offense, was charged in juvenile court with delinquent conduct by committing murder. The State filed a

petition asking the juvenile court to waive its jurisdiction and transfer J.R.'s case to criminal district court. *See* TEX. FAM. CODE ANN. § 54.02. As required by section 54.02(d), the juvenile court ordered a complete diagnostic study, social evaluation, and full investigation of J.R., his circumstances, and the circumstances of the alleged offense, including a psychological evaluation.

After the evaluations were complete, the juvenile court conducted an evidentiary hearing on the State's motion to transfer. The parties stipulated that J.R.'s birthdate was September 1, 2003, making him sixteen years old at the time of the offense and seventeen years old at the hearing. The court took judicial notice of the social evaluation and investigative report, an addendum to that report, and the psychological evaluation and diagnostic study. In addition, three witnesses testified, two for the State and one for the defense.

## A. The Offense

On the night of October 31, 2019, seventy-nine-year-old Gloria Roque was sitting on the couch watching TV when multiple rounds of gunfire were shot into her house. One of the bullets struck Roque in the back, killing her. Other bullets hit a car in her driveway and the front door of an adjacent house. After an investigation, Detective John Valdez of the Dallas Police Department determined that Roque was the unintended target of a drive-by shooting.

Two days after the shooting, Valdez received a tip from a juvenile implicating J.R., Kimberly Garcia, and David Alvarado. Valdez obtained search warrants for

social media and cell phone records of the group.  Information from these records––before, during, and after the shooting—linked them to the offense.  For example, on the day of the offense, J.R. posted to his Instagram account that it was the "devil's day so we gotta purge from my 'N.'" Valdez believed the post meant that J.R. "had something planned."  The account showed that Garcia sent J.R. a map depicting the area where the offense occurred, and J.R. posted to Alvarado and others in the same thread that Garcia had shown him "where that 'N' stays."  The post did not indicate the identity of the intended victim.

After the offense was committed, J.R. made several statements on Instagram: "hell, no, I ain't trying to get caught"; "I told you to lay low"; "delete all your pictures"; and "don't say shit."  In response to the last statement, Alvarado told J.R. to "chill."  The thread also included a screenshot of a news story on the shooting with a photograph of the crime scene.

In addition to the social media account information, Valdez tracked the group's movements that day through their cell phone records.  Those records showed the three in the Seagoville-Balch Springs-Pleasant Grove area during the day.  At about 10:30 p.m., they traveled from Pleasant Grove to south Dallas, as evidenced by their phones hitting off cell phone towers in the two-block area of Roque's home, where the three stayed for a few minutes before traveling back to their neighborhood.

Valdez interviewed J.R., Garcia, and Alvarado. J.R. admitted he was with Garcia, Alvarado, and a 13-year-old boy, R.R.,[1] on the night of the shooting. He said they drove to south Dallas because Garcia had "an issue" with Tommy Gouche, an ex-boyfriend who had cheated on her. J.R. told Valdez that "somebody" may have had two guns, but when Valdez sought more specific information, J.R.'s mother stopped the interview.

Garcia, who was seventeen years old at the time of the offense, initially denied any involvement but then changed her story. She told Valdez that J.R. had talked about a "purge" and said they were going to "slide up" on Tommy, which Valdez said meant a "drive-by."

On the night of the offense, Garcia drove to the location in her grandmother's car; R.R. was in the front passenger seat, and J.R. and Alvarado were in the backseat. As they drove by the Roque residence, one of them said, "There's his car there."[2] She said Alvarado began firing out of the passenger side and J.R. stood up through the sunroof and fired.[3] Afterwards, she took everyone home.

The next day, the group learned that the "wrong house" was targeted. Garcia found shell casings in her car and threw them away. She also told Valdez that J.R. brought alcohol over to "wipe down" the car or suggested she burn it. Garcia

---

[1] R.R. was not charged in this case, but Garcia and Alvarado were both charged as adults with murder.

[2] Valdez testified he "could never get why" they looked for Tommy on this particular street.

[3] Police obtained videos from nearby homes that showed a four-door sedan with a sunroof appearing to flee the area at the time of the shooting.

claimed she and R.R. were not armed that night, and blamed J.R. and Alvarado for the shooting. In contrast, Alvarado, who also had previously dated Garcia, told Valdez that J.R. and Garcia had the guns and fired at the house they believed was Tommy's. Valdez also interviewed Tommy, who said he had never met J.R. in person, but the two had threatened each other on social media. He said the "beef" involved Alvarado and a third party.

Based on his investigation and the evidence, Valdez believed the offense was planned and intentional. He said the group talked about shooting up the house, drove there from Pleasant Grove, identified a car in the driveway as Tommy's, fired multiple times at the house, fled the scene, and went home.

Valdez testified there was probable cause to believe that J.R. committed the murder of Roque. He also testified that because of the seriousness of the offense and J.R.'s background, the welfare of the community required criminal proceedings. According to Valdez, J.R.'s conduct was willful and violent and a deadly weapon was used. He explained that the offense occurred just six weeks after J.R. was released from a juvenile placement for aggravated robbery, indicating that J.R. had not accepted or responded to supervision. Alvarado was a co-defendant in the aggravated robbery, which further indicated that J.R. has refused to remain away from negative peers or those who habitually violate the law.

Valdez believed that J.R.'s history indicated a need for placement in a controlled structured facility and the prior juvenile placement did not adequately

protect the public and rehabilitate J.R. He said J.R.'s background as well as his actions after this offense suggested to him that J.R. is a danger to the community. In particular, he pointed out that on social media accounts, J.R. and his friends constantly talk about "hitting licks," "smoking dope," "robbing dope dealers" and display "pictures of guns." He pointed out that about six weeks after Roque's death, J.R. went on Instagram Live, walked down a street with a gun, in daylight, and talked about how "he can do what he wants." When J.R.'s friends posted to remind him that the police were "looking" for him, J.R. indicated he did not care, saying that "if cops come looking for him, he's got something for them. And he's showing pictures of a gun." Later, when the police searched the home of J.R's. mother, they found a gun in J.R.'s room that Valdez believed was the one shown in the Instagram Live video. (It was not the gun used in Roque's killing.) Valdez believed these actions indicated that Roque's shooting "had no effect on him, how he - - what he thinks or does."

On cross-examination, Valdez agreed that Roque was not the intended target and that the shooter or shooters did not intend that she be killed; however, he also explained that the group intended to harm someone. Defense counsel suggested that the shooters were unaware that anyone was home, which if true would support a lesser charge, but Valdez said he never considered a deadly conduct or manslaughter charge. Valdez acknowledged that he did not have any physical evidence or non-

co-defendant testimony to support that J.R. pulled the trigger. He also agreed that the three suspects minimized their parts and placed blame on each other.

## B. Social Evaluation and Investigative Report

The State's second witness was Shannon Wright, who had worked for nineteen years as a juvenile probation officer in the court assessment unit. Wright prepared the social evaluation and investigative report on J.R.

Wright testified that J.R. was first referred to the juvenile department in December 2016 on a misdemeanor graffiti charge. The case was referred to the Deferred Prosecution Department, and J.R. successfully completed the deferred program in April 2017.

His next referral was in December 2018 for aggravated robbery. According to Wright, J.R. and Alvarado (his co-defendant in the murder case) asked for a ride from the complainant. The complainant, who knew J.R., agreed. Once in the car, J.R. pointed a gun at the complainant and forced him to drive to a convenience store. The complainant then got out, and J.R. and Alvarado fled in the vehicle, abandoning it once it ran out of gas.

J.R. was adjudicated on the aggravated robbery charge on May 1, 2019 and was ordered to Dallas County Youth Village. Wright said while he was there, he had only one incident of fighting, but it was "not a major incident." J.R. complied with all of the rules of the facility, completed all of the programming within his treatment, and was released on probation to his grandmother on September 11, 2019.

Three months later, on December 13, J.R. appeared at a review hearing. At that hearing, there was evidence that J.R. had received a citation for being in a stolen car, had refused to go to school, had tested positive for marijuana, had displayed a gun on social media, and was violating curfew. Consequently, he was taken into custody and placed in Marzelle Hill Transition Center. He was successfully discharged on January 3, 2020 to his mother. One month later, J.R. was arrested on the current charge and placed in the juvenile detention center.

Wright testified that the psychology department prepared a psychological evaluation and diagnostic study. The report was prepared by Frederica Adams, a mental health clinician, and approved by her supervising psychologist, Dr. Leilani Hinton. According to Wright, the report showed that J.R. had conduct disorder, unspecified bipolar and related disorder, ASD (autism spectrum disorder), and ADHD. Wright said that, even considering those, the psychological evaluation indicated J.R.'s sophistication and maturity levels seemed appropriate for someone his age. Wright acknowledged that J.R. had not received any services to assist with these issues previously because the family did not disclose that J.R. had any mental health issues until after this latest offense. She said she was aware the family is now willing to participate in such services to keep the matter in juvenile court.

As part of her social evaluation, Wright also considered J.R.'s sophistication and maturity. Wright said she believed J.R.'s level of sophistication was "excessive" and, as support, relied on his referral history, the nature of the offense, the placement,

and the fact J.R. continued to engage in delinquent activities and continued to associate with peers who were also engaging in criminal and delinquent activity. In addition, she considered his history with firearms. Specifically, she referenced his social media posts, the seizure of a gun from his bedroom, the prior aggravated robbery adjudication, and the current offense. She also expressed concern about the short time between his release from Youth Village and the commission of this offense during which J.R. was on probation.

Wright also opined that J.R.'s maturity level was "age appropriate" and noted that he had not lived independently and relied on his mother, father, and grandparents for everyday living. She also believed that J.R. had not accepted or responded to supervision. Based on the fact that he completed Youth Village but continues to associate with his co-defendants and was alleged to have committed a murder, she believed that he was not rehabilitated by his time at Youth Village.

Wright was familiar with the services offered by the juvenile department and did not believe J.R. could be rehabilitated by those services because the department has tried with him and failed. She likewise did not believe the public could be protected using juvenile services and facilities. Given his history and placements, she believed that he was in need of a controlled structured facility. She also understood that his co-defendants in this offense were adults and believed it would be best for all of them to be tried in one court. She explained that the individuals are

"pointing fingers at each other," the offense appeared to be premeditated with intent to hurt someone, J.R. was on probation at the time, and someone lost her life.

Finally, she stressed that J.R.'s history needed to be taken into account. She said he targeted the home of the wrong individual, but his actions that night showed his intent was to harm someone. She recommended that the petition for discretionary transfer be granted.

On cross-examination, Wright could not answer whether there are programs to address J.R.'s mental needs in the adult prison, but agreed it would be a concern if his needs could not be addressed there. She acknowledged that now that the juvenile department knows of his mental health needs, they could be adequately treated, and further acknowledged that Lyle B. Medlock Residential Treatment Center had agreed to house J.R. When asked, Wright said she knew of no reason why the community would be in danger if J.R. were sentenced to the Texas Juvenile Justice Department and agreed that J.R. could be treated in the TJJD within the recommendations contained in the psychological assessment—that he be placed in a structured environment and have clear guidelines to follow. But, she explained, J.R. could be placed in TJJD only until his 19th birthday.

## C. Psychological Evaluation and Diagnostic Study

The trial court took judicial notice of the psychological evaluation and diagnostic study prepared by Adams and approved by Hinton. J.R. was administered the Kaufman Brief Intelligence Test (KBIT), which is a brief measure of intelligence, and the Wide Range Achievement Test (WRAT-4), which measures fundamental academic skills. J.R. scored in the below average range of intellectual functioning with a composite IQ score of 81, which placed him in the bottom 10 percent. His verbal score was well below average, falling in the bottom 4 percent, while his nonverbal abilities scored in the average range, meaning he performed better than 34 percent of his age-matched peers.

On the achievement functioning test, J.R. was tested in word reading, spelling, math computation, sentence comprehension, and reading composite. His performance ranged from the "Very Low" range to "Average" range of ability. He performed best in spelling, with an eight-grade equivalency; the remaining scores were all fourth- or fifth-grade equivalent. J.R. was at the time a tenth-grade student who was one grade level behind.

Other testing revealed that J.R. was concerned about his future and what his consequences would be and that he may have "regrets for some past actions." He "missed his mother and father" and his responses suggested a minimal level of depression. Diagnostic impressions from the evaluation were that he has conduct disorder, unspecified bipolar and unrelated disorder (by history), unspecified ADHD

(by history), mild cannibus use disorder, and academic or educational problems. The Positive Achievement Change Tool (PACT), completed on March 3, 2020, indicated J.R.'s "overall risk to reoffend as high."

Adams concluded that J.R. was not a person "with mental retardation or a person with a significant mental illness" as defined by statute. She also concluded his sophistication and maturity levels appeared to be "commensurate to his same aged peers" and that J.R. appeared to be capable of understanding the legal implications surrounding a discretionary transfer motion and of assisting his attorney in his defense.

## D. Defense Witness

The sole defense witness was Tami Coy, who works for TJJD as the TJJD/TDCJ liaison and oversees the department of sentence offender disposition. Coy explained that her department reviews all the determinate sentence offenders, submits paperwork for release to parole, attends release transfer hearings, early transfer hearings, and certification hearings.

Coy explained the process if J.R. were adjudicated within the juvenile system on a determinate system for murder. She said he would initially be placed in the intake unit in Brownwood for about a month. During that time, he would undergo psychological, psychiatric, and educational evaluations to determine his treatment needs and programs. Depending on factors like mental health, he likely would be placed in the capital and serious violent offender program at Giddings State School,

a high restriction facility with ten dormitories and multiple specialized treatment programs. There, juveniles have sixteen-hour days with a restrictive schedule. If a juvenile misbehaves, he is removed from the general population and placed in a redirect program with even stricter rules.

Because J.R. was already seventeen years old and had been in detention for only a short while, Coy testified that he would not be able to meet the three-year minimum period of confinement by law, meaning a release transfer hearing would need to be held before his 19th birthday. But, she said, he would get services that could benefit him in the time he spent in the juvenile facility, even if that time were a year or less. Coy made no recommendation on whether J.R. should be certified or not.

After hearing the witnesses' testimony, the juvenile court took the matter under advisement. Two days later, the juvenile court certified J.R. to be tried as an adult and transferred the criminal proceedings to a criminal district court. The court made oral findings, which subsequently were incorporated into its written order. *See* TEX. FAM. CODE ANN. § 54.02(h). J.R. appeals that order.

## STANDARDS FOR WAIVER OF JUVENILE JURISDICTION

Because children 10 years of age or older and under 17 years of age are not subject to prosecution in adult court for criminal offenses, the juvenile court has exclusive original jurisdiction over cases involving what would otherwise be criminal conduct. *See* TEX. FAM. CODE ANN. § 51.02(2), 51.03(a)(1), 51.04(a). But

–13–

if a juvenile court determines after a full investigation and hearing that certain conditions are met, it may waive jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings. *See id.* § 54.02(a), (c); *In the Matter of S.G.R.*, 496 S.W.3d 235, 238 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

To waive jurisdiction and transfer a child to the criminal district court, the juvenile court had to find (1) the child was alleged to have committed a felony offense, (2) the child was 14 years of age or older at the time of the offense if the offense is a first-degree felony, and no adjudication hearing had been held, (3) after full investigation and hearing, there is probable cause to believe the child committed the alleged offense, and because of the seriousness of the offense or the background of the child, the welfare of the community requires criminal proceedings rather than juvenile proceedings. *See* TEX. FAM. CODE ANN. § 54.02(a).

In making the determinations required by section 54.02(a), the juvenile court was required to consider, among other matters: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of J.R.; (3) the record and previous history of J.R.; and (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of J.R. by use of procedures, services, and facilities currently available to the juvenile court. *See id.* § 54.02(f).

These are nonexclusive factors that serve to facilitate the juvenile court's balancing of "the potential danger to the public" posed by the juvenile offender with his "amenability to treatment." *Moon v. State*, 451 S.W.3d 28, 38 (Tex. Crim. App. 2014) (quoting *Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)). Section 54.02(h) of the family code requires that if the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court . . . ." TEX. FAM. CODE ANN. § 54.02(h); *Moon*, 451 S.W.3d at 49.

Although the order must show the juvenile court considered the four factors in section 54.02(f), the court "need make no particular findings of fact with respect to those factors." *Moon*, 451 S.W.3d at 41–42; *In the Matter of L.W.*, No. 05-19-00966-CV, 2020 WL 728431, at *8 (Tex. App.—Dallas Feb. 13, 2020, no pet.) (mem. op.); *see also In the Matter of D.L.C.*, No. 06-16-00058-CV, 2017 WL 1055680, at *6 (Tex. App.—Texarkana Mar. 21, 2017, no pet.) (mem. op.). Moreover, the court may order a transfer on the strength of any combination of the criteria listed in section 54.02(f). *Hidalgo*, 983 S.W.2d at 754 n.16; *In the Matter of K.M.D.*, 05-17-01284-CV, 2018 WL 3238142, at *2–3 (Tex. App.—Dallas July 3, 2018, no pet.) (mem. op.). At the transfer hearing, the State bears the burden of proving, by a preponderance of the evidence, that waiver of the juvenile court's jurisdiction is appropriate. *Moon*, 451 S.W.3d at 40–41.

# APPELLATE REVIEW

In evaluating a juvenile court's decision to waive jurisdiction, we first review the juvenile court's specific findings of fact regarding the section 54.02(f) factors under "traditional sufficiency of the evidence review." *Moon*, 451 S.W.3d at 47. Second, we review the juvenile court's ultimate waiver decision for an abuse of discretion. *S.G.R.*, 496 S.W.3d at 239 (citing *Moon*, 451 S.W.3d at 47). A juvenile court abuses its discretion when its decision to transfer is essentially arbitrary, given the evidence upon which it was based. *Moon*, 451 S.W.3d at 47. "As with any decision that lies within the discretion of the trial court, the salient question is not whether we might have decided the issue differently." *S.G.R.*, 496 S.W.3d at 239. "Instead, we consider in light of our review of the sufficiency of the evidence whether the juvenile court's decision represents a reasonably principled application of the Section 54.02(f) factors or was essentially arbitrary or made without reference to the statutory criteria for waiver." *Id.* (citing *Moon*, 451 S.W.3d at 47). And, we must keep in mind that not every section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction. *Moon*, 451 S.W.3d at 47.

As long as the juvenile court correctly applies these statutory criteria and complies with the requirement to specifically state its supporting findings, its waiver decision generally will pass muster under this standard of review. *Moon*, 451 S.W.3d at 49. "[A] juvenile court that shows its work should rarely be reversed." *Id.*

## ANALYSIS

In two issues, J.R. argues the juvenile court's certification and transfer order should be reversed because (1) the order failed to include any evidence of mitigating factors and (2) the evidence was factually insufficient to support a finding that he was sufficiently sophisticated and mature. We begin with the order itself.

### A. The Order

In its order, the juvenile court made findings that (1) J.R. was alleged to have committed a murder, (2) he was sixteen years old at the time of the offense, (3) no adjudication hearing has been held; (4) there is probable cause to believe he committed the offense, and (5) because of the seriousness of the offense and the background of J.R., the welfare of the community required criminal proceedings. *See* TEX. FAM. CODE ANN. § 54.02(a). The court also stated that, after considering all of the testimony, diagnostic study, social evaluation, and full investigation, it was contrary to the best interest of the public to retain jurisdiction.

The court set out a number of "reasons" and "specific findings" supporting its disposition. *See id.* § 54.02(f). Those findings and reasons include that J.R. was charged with murder; a firearm was used during the course of the offense; personal injury and death resulted to Roque; his conduct was "willful and violent;" the offense was "so serious" that transfer to a criminal district court must be granted; J.R. has not accepted or responded to supervision as he had several violations of probation after his release from placement at Dallas County Youth Village; J.R. refuses to

–17–

remain away from associates who habitually violate the law as evidenced by the fact that the accomplice in the alleged offense was an accomplice in a previous offense; J.R. was of "excessive sophistication" and his level of maturity was sufficient to be tried as an adult and to aid an attorney in his defense; his background indicates the welfare of the community requires criminal prosecution; his previous history indicates a present need for placement in a controlled, structured facility as J.R. was on probation for aggravated robbery when this offense was committed; the public needs protection from him; the prospects of adequate protections of the public and the likelihood of rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court are remote as J.R. was previously adjudicated of aggravated robbery and placed at the Dallas County Youth Village; it is "desirable" that all parties to the offense be tried in one court since the accomplices are adults; and J.R. was on probation when the offense was committed and the offense was committed six weeks after he was released from Dallas County Youth Village.

## B. Specificity of Order

In his first issue, J.R. contends the order in this case contains only a "rote iteration" of his "bad acts" without including evidence of his "low intellect, his mental disorders, his Autism Spectrum Disorder, his Bipolar Disorder, or his exceptional conduct when in juvenile custody. . ." J.R. argues that by failing to

include the latter evidence in its order, the trial court failed to show its "deliberative process" and thus failed to "honor" the requirements of section 54.02 and *Moon*.

While we agree the juvenile court is required to consider mitigation evidence as part of its deliberative process,[4] the plain language of the statute merely requires it to specify its reasons and findings *for* waiver. *See also* TEX. FAM. CODE ANN. § 54.02(h) ("If the juvenile court waives jurisdiction, it shall specifically state in the order its reasons for waiver . . . ."); *Moon*, 451 S.W.3d at 49 (". . . Section 54.02(h) obviously contemplates that both the juvenile court's reasons for waiving its jurisdiction and the findings of fact that undergird these reasons should appear in the transfer order."). The statute does not require the juvenile court to exhaustively catalog all evidence introduced during the transfer hearing in its written order. *See S.G.R.*, 496 S.W.3d at 241. Nothing in the statute or *Moon* suggests what J.R. would require: that in addition to stating its reasons in favor of transfer, the juvenile court must also recite all of the mitigating factors contained in the record with an explanation as to why it rejected those facts in favor of waiver and transfer.

To the extent appellant argues we are precluded from making a "meaningful appellate review" if a juvenile court is allowed "not to include the evidence that weighed against certification in the § 54.02(h) order," we are unpersuaded. Under a factual sufficiency challenge, we consider all the evidence presented to determine if

---

[4] *See In the Matter of A.K.*, No. 02-19-00385-CV, 2020 WL 1646899, at *8 (Tex. App.—Fort Worth Apr. 2, 2020, no pet.) (mem. op.) (explaining that mitigation evidence falls within section 54.02(f) factors, and juvenile court is required to consider it).

–19–

the court's finding is so against the great weight and preponderance of that evidence as to be clearly wrong and unjust. *In the Matter of A.B.*, No. 02-18-00274-CV, 2019 WL 983751, at *3 (Tex. App.—Fort Worth Feb. 28, 2019, no pet.) (mem. op.). In other words, we set the finding aside only if, after considering and weighing all the evidence pertinent to that finding, we determine that the credible evidence supporting it is so weak or so contrary to the overwhelming weight of all the evidence that it should be set aside. *Id.*

Finally, we note that the crux of J.R.'s complaint is that the order "provides no indication" that the juvenile court considered the mitigating evidence. J.R. relies primarily on the court-ordered reports as support for these specific facts. In its order, the juvenile court explicitly stated that it considered "all the testimony, diagnostic study, social evaluation, and full investigation" in determining the State's petition for discretionary transfer. Thus, while the order does not set out the particular mitigating evidence, the order specifically states that the court considered the source material in making its determination.

J.R. does not complain that the order is insufficiently specific with regard to the findings actually made; thus, we need not review that aspect of the order.

For the reasons set out above, we overrule J.R.'s first issue.

**B. Sophistication and Maturity**

–20–

In his second issue, J.R. contends the evidence is factually insufficient to support a finding that he is sufficiently sophisticated and mature to certify him as an adult.

The purpose of an inquiry into the mental ability and maturity of the juvenile is to determine whether he appreciates the nature and effect of his voluntary actions and whether they were right or wrong. *Moon*, 451 S.W.3d at 50 n.87 (citing *In the Matter of E.D.N.*, 635 S.W.2d 798, 801 (Tex. App.—Corpus Christi–Edinburg 1982, no writ)).

In its written order, the juvenile court made findings that corresponded to each of the section 54.02(f) factors, including that J.R. was of "excessive sophistication" for his age and his level of maturity was "sufficient to be tried as an adult and to aid an attorney in his defense." In addition, the court made the following factual findings relevant to sophistication and maturity: (1) J.R. has not accepted or responded to supervision as shown by the fact he had several probation violations after being released from placements at Village; (2) he has refused to stay away from associates who habitually violate the law as evidenced by the fact an accomplice in this offense was an accomplice in the aggravated robbery; (3) he was previously adjudicated of aggravated robbery and placed at Youth Village; (4) he was on probation for aggravated robbery when this offense was committed; and (5) this offense was committed six weeks after his release from Youth Village. These facts were supported by the testimony of Valdez and Wright as well as the court-ordered

–21–

reports and further support the trial court's findings of sophistication and maturity. *See In the Matter of G.B.*, 524 S.W.3d 906, 919 (Tex. App.—Fort Worth 2017, no pet.) (relying on juvenile's criminal referrals before and after the murder, his failure to use opportunity to rehabilitate with services available to him and instead escalating criminal behavior, and juvenile's behavior in committing murder as supporting sophistication and maturity finding).

J.R. acknowledges that the psychological evaluation found his sophistication and maturity levels "commensurate to his same aged peers" and that the social evaluation found his sophistication "excessive." He argues, however, that the record shows the opposite and directs us to evidence of (1) his discussion or posts related to the offense on publicly accessible social media pages; (2) his proposal to burn the car used in the shooting; (3) his mental health issues, including Autism Spectrum Disorder, Bipolar Disorder, ADHD, and a "minimum level" of depression; (4) his ability to respond well in a highly structured environment, (5) his below-average intelligence, and (6) inability to live on his own and reliance on mother and grandmother for his "basic needs."

Appellant does not explain how evidence that he discussed or posted about the offense on his publicly accessible Instagram account suggests he lacks sophistication or maturity. Presumably, he believes that a more mature or sophisticated person would know better. But evidence of social media accounts is not uncommon in adult criminal prosecutions. *See e.g., Tienda v. State*, 358 S.W.3d

–22–

633, 635–36 (Tex. Crim. App. 2012) (admission of MySpace pages to link defendant to shooting); *Beham v. State*, 559 S.W.3d 474, 476–77 (Tex. Crim. App. 2018) (admission of photographs posted on defendant's Facebook page as evidence of defendant's gang involvement); *Hunter v. State*, No. 05-18-00458-CR, 2019 WL 2521721, at *3 (Tex. App.—Dallas June 19, 2019, pet. ref'd) (mem. op., not designated for publication) (defendant's post on Facebook about wanting to commit a robbery in capital murder trial).

Likewise, attempts to conceal evidence of the crime may show sophistication and maturity, not the lack of, and indicate a person appreciates that his conduct is wrongful. *See In the Matter of K.M.*, No. 01-20-00121-CV, 2020 WL 4210493, at *11 (Tex. App.—Houston [1st Dist.] July 23, 2020, no pet.) (mem. op.) (evidence that juvenile attempted to conceal participation in crime was fact supporting sophistication and maturity); *see Hill v. State*, No. 05-18-01011-CR, 2020 WL 2124520, at *6 (Tex. App.—Dallas May 5, 2020, no pet.) (mem. op., not designated for publication) (attempt to conceal incriminating evidence is evidence of culpable mental state for murder).

J.R. also directs us to evidence that he does well in a structured environment and not so well in an unstructured environment, and argues the difference is attributable to his sophistication and maturity, relying on various federal cases that he contends discuss the immaturity of the adolescent brain. *See Miller v. Alabama*, 567 U.S. 460, 479 (2012) (holding that Eighth Amendment forbids sentencing

scheme that mandates life in prison without possibility of parole for juvenile offenders); *Roper v. Simmons*, 543 U.S. 551, 578–79 (2005) (holding that Eight Amendment bars capital punishment for juvenile offenders under age of eighteen); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol*, *Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) (upholding constitutionality of federal statute barring licensed gun dealers from selling handguns to persons under the age of twenty-one ; *Kelly v. Brown*, 851 F.3d 686 (7th Cir. 2017) (rejecting claim that 110-year sentence for two murders committed by juvenile when he was sixteen violated *Miller v. Alabama*) (Posner, J., dissenting); *Khalifa v. Cash*, 594 F. App'x 339 (9th Cir. 2014) (rejecting claim that defendant's Sixth Amendment speedy trial rights were violated) (Pregerson, J., dissenting).   But in weighing the evidence, the juvenile court expressly noted that it was only six weeks after his release from Youth Village, and while he was on probation for aggravated robbery, that the current offense was committed.  From this, the juvenile court could have concluded that J.R. knew that he needed to conduct himself in a certain way to be released from detention, which indicates a higher level of sophistication.

As for his mental health status and low intelligence, there is no evidence that these issues impacted his ability to evaluate and process information.  To the contrary, after weighing the results of all the testing, the psychologist concluded that J.R. was "not a person with mental retardation or a person with significant mental illness" as defined by statute and determined that, overall, J.R. appeared to be

capable of understanding the legal implications of a discretionary transfer motion and of assisting his attorney in his defense. *See In the Matter of K.D.S.*, 808 S.W.2d 299, 302–03 (Tex. App.—Houston 1991, no pet.) (concluding evidence factually sufficient to support sophistication and maturity in juvenile with I.Q. "just above the retarded range" and maturity of nine- to eleven-year-old child when evidence showed child capable of understanding proceeding, could assist her attorneys in her defense, and was intellectually capable of distinguishing right from wrong). That study showed that while J.R. did not discuss the details of his offense, he knew he was charged with murder, acknowledged it as a serious offense, "demonstrated knowledge of possible consequences for such a crime, and stated the consequences had been explained to him." Finally, the fact that J.R., as a 16-year-old at the time of the offense, would be reliant on adults in his life for his "basic needs" is not unusual or dispositive.

Having reviewed all of the evidence, we conclude it shows that J.R. could appreciate the nature and effect of his actions and understood right from wrong. The evidence also showed that he could assist in his defense. We further conclude the juvenile court's finding that J.R. was sufficiently sophisticated and mature to be tried as an adult was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

Having so concluded, we next consider whether the trial court abused its discretion by waiving jurisdiction and transferring J.R.'s case. *See Moon*, 451

–25–

S.W.3d at 47. The court's order reflects findings that all of the section 54.02(f) factors supported waiver and transfer. J.R. challenged only the factual sufficiency of the sophistication and maturity prong; he has not challenged that the State met the three remaining factors.[5] Given the evidence before us and the juvenile court's findings, we further conclude the court did not abuse its discretion by waiving its jurisdiction and transferring J.R.'s case because the record shows that it acted with reference to guiding rules and principles in reaching its decision. We overrule the second issue.

We affirm the juvenile court's order waiving jurisdiction and transferring J.R.'s case to criminal district court.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

200920F.P05

---

[5] We note there need not be evidence in support of every section 54.02(f) factor weighing in favor of transfer, so long as there is sufficient overall evidence to justify the juvenile court's decision. *See Moon*, 451 S.W.3d at 49 ("And, of course, reviewing courts should bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive jurisdiction."); *In re K.J.*, 493 S.W.3d 140, 152 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (noting that even though appellant displayed immature behavior that could be contrary to maturity finding, not every factor must weigh in favor of transfer). Here, J.R. does not argue that the remaining factors were unsupported by the evidence or analyze them in context of the trial court's overall decision; rather, he asserts that error on the sophistication prong cannot be harmless when "sophistication and maturity are arguably the most important." Nothing in the statute elevates this prong any higher than the other factors that the court must consider.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE MATTER OF J.R., A
JUVENILE

No. 05-20-00920-CV

On Appeal from the 305th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. JD-20-00313-
X.
Opinion delivered by Justice
Reichek; Justices Pedersen, III and
Garcia participating.

In accordance with this Court's opinion of this date, the trial court's Waiver
of Jurisdiction and Order of Transfer to a Criminal District Court is **AFFIRMED**.

Judgment entered March 1, 2021.