In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1244

MCKINLEY KELLY,

*Applicant*,

*v.*

RICHARD BROWN,

*Respondent*.

On Motion for an Order Authorizing the District Court to Entertain a
Second or Successive Petition for Collateral Review.

SUBMITTED FEBRUARY 6, 2017 — DECIDED MARCH 16, 2017

Before WOOD, *Chief Judge*, POSNER, and MANION, *Circuit Judges*.

MANION, *Circuit Judge*. McKinley Kelly has filed an application pursuant to 28 U.S.C. § 2244(b)(3), seeking authorization to file a second or successive petition for a writ of habeas corpus under § 2254. Kelly is serving a 110-year sentence (two consecutive terms of 55 years) for two murders he committed when he was 16 years old. He will first be eligible for parole on February 1, 2050, when he will be 70 years old. Kelly wants to challenge his sentence under *Miller v. Alabama*, 132 S. Ct.

2455 (2012) (mandatory life sentences for juvenile offenders is unconstitutional), which was made retroactive by *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). *Miller* applies not just to sentences of natural life, but also to sentences so long that, although set out as a term of years, they are in reality a life sentence. *McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016).

Because Kelly stated a possible claim to relief under *Miller*, we invited the State to respond, which it has done. It argues that Kelly cannot state a claim to relief under *Miller* because his sentencing judge was afforded significant discretion by the Indiana Code to fashion an appropriate sentence and, in fact, considered Kelly's age at the time of the offense in mitigation.

In resolving Kelly's direct appeal, the Supreme Court of Indiana explained that IC § 35-50-2-3 set a presumptive sentence of 55 years for murder and allowed a sentencing court to increase or decrease the presumptive sentence by no more than ten years for special circumstances. The court also was allowed to decide whether sentences for multiple convictions should run concurrently or consecutively. IC § 35-38-1-7.1. *Kelly v. State*, 719 N.E. 2d 391, 394-95 (Ind. 1999). In other words, Kelly's sentence could have been as low as 45 years (55 minus 10 for each count, with the two sentences running concurrently) or as high as 130 years (55 plus 10 for each count, with the two sentences running consecutively).

In Kelly's case, counsel argued his age in mitigation, pressing hard on the fact that "[n]obody is the same person when they're 25 or 35 or 45 or whatever, that they were when they were 16," and "[y]ou don't know to what extent their conduct is the product of gross immaturity or whether there

is something more missing." (Sent'g Tr. at 1326-27.) The sentencing judge identified six aggravating circumstances:

>        (1) Kelly was on probation with the Juvenile Court at the time of the crimes;

>        (2) Kelly fired the first shot and his shots killed the first of three victims, setting the subsequent murders in motion;

>        (3) Kelly shot the victims at close range;

>        (4) the murders evince Kelly's lack of respect for human life;

>        (5) there was a risk that Kelly would commit future crimes; and

>        (6) Kelly killed more than one person.

It then considered two mitigating conditions:

>        (1) Kelly was sixteen years old at the time of the offense and seventeen years old at the time of sentencing; and

>        (2) Kelly had no adult or felony convictions.

*Kelly*, 719 N.E. 2d at 395. The Indiana Supreme Court affirmed Kelly's sentence, holding that, "[d]espite its long list of identified and recognized aggravating circumstances, the trial court imposed the presumptive, rather than an aggravated, sentence for each murder. The trial court properly outlined its reasoning for [Kelly's] sentences, and adequately balanced the aggravating and mitigating circumstances with which it was presented." *Id*. at 395.

We agree with the State: Kelly was afforded all he was entitled to under *Miller*. The sentencing court had considerable leeway in fashioning Kelly's sentence and in fact considered his age when deciding on the appropriate term. Accordingly, we **DENY** authorization and **DISMISS** his application.

POSNER, *Circuit Judge*, dissenting. When McKinley Kelly was 16 years old, he shot and killed two people. Tried and convicted in an Indiana state court of the two murders, he was sentenced to 110 years in prison. Even if, as the State says, Kelly will be eligible for parole when he is 70, he nevertheless is effectively serving a life sentence. The ACLU of Michigan reports that the average life expectancy of an inmate sentenced to life in prison is 58 years; for African-Americans like Kelly the average life expectancy is 56; and for juveniles sentenced to life the average is 50½ years. See ACLU of Michigan, "Michigan Life Expectancy Data for Youth Serving Natural Life Sentences," April 2013, http://fairsentencingofyouth.org/wp-content/uploads/2010/ 02/Michigan-Life-Expectancy-Data-Youth-Serving-Life.pdf (visited March 15, 2017, as were the other websites in this opinion).

Kelly claims that his sentence is unconstitutional and that he therefore is entitled to be resentenced. We should authorize the district court to accept a second petition for a writ of habeas corpus from Kelly, to enable the validity of his claim to be determined.

The Supreme Court, in *Miller v. Alabama*, 132 S. Ct. 2455, 2469 (2012), outlawed statutes that require judges to impose a life sentence without parole on a juvenile offender, defined as anyone who committed the crime (or crimes) before his eighteenth birthday. *Miller* requires judges to give special consideration to the fact of youth and how it reflects on the culpability of the offender. For "children are constitutionally different from adults for purposes of sentencing … because juveniles have diminished culpability and greater prospects for reform." *Id.* at 2464. "[Y]outh is more than a chronologi-

cal fact. It is a time of immaturity, irresponsibility, impetu-
ousness, and recklessness. It is a moment and condition of
life when a person may be most susceptible to influence and
to psychological damage. And its signature qualities are all
transient." *Id*. at 2467 (citations omitted); see also *id*. at 2468;
*Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016).

In 2015 the Department of Justice released data from a 7-
year longitudinal study of more than 1,300 "serious juvenile
offenders"—those who had committed felony-level violent,
property, or drug crimes. See Laurence Steinberg *et al*., "Psy-
chosocial Maturity and Desistance From Crime in a Sample
of Serious Juvenile Offenders," Office of Juvenile Justice and
Delinquency Prevention, March 2015, www.ojjdp.gov/
pubs/248391.pdf; Melissa Sickmund and Charles Puzzanche-
ra, eds., "Juvenile Offenders and Victims: 2014 National Re-
port," Ch. 3, National Center for Juvenile Justice, December
2014, www.ojjdp.gov/ojstatbb/nr2014/downloads/NR2014.
pdf. The Justice Department study revealed that more than
90 percent of juvenile offenders grow out of such antisocial
behavior by young adulthood and do not re-offend after
their first contact with a court—and that regardless of the
sanction imposed on the child. Even after matching the sub-
jects with the gravity of their offenses—whether they were
incarcerated, placed in residential facilities, put on proba-
tion, or received community-based services—the vast major-
ity did not re-offend; instead they grew up. Thomas A.
Loughran *et al.*, "Studying Deterrence Among High-Risk
Adolescents," August 2015, Office of Juvenile Justice and
Delinquency Prevention, www.ojjdp.gov/pubs/248617.pdf.
Researchers conclude that "most juvenile offending is, in
fact, limited to adolescence" and that "the process of matur-
ing out of crime is linked to the process of maturing more

generally, including the development of impulse control and future orientation." Steinberg *et al.*, *supra*, at 1. The "signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside," and generally does. *Roper v. Simmons*, 543 U.S. 551, 570 (2005), quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993).

As a result of these insights, nineteen states now prohibit imposing a life sentence without parole on a juvenile, The Sentencing Project, "State Advances in Criminal Justice Reform, 2016," p. 4, January 2017, www.sentencingproject.org/ publications/state-advances-criminal-justice-reform-2016; the incarceration of juveniles in both adult and juvenile facilities has fallen, Ashley Nellis & Marc Mauer, "What We Can Learn from the Amazing Drop in Juvenile Incarceration," January 24, 2017, www.themarshallproject.org/2017/01/24/ what-we-can-learn-from-the-amazing-drop-in-juvenile-incarceration#.tWDqrzgtg; and likewise the number of homicides committed by juveniles, "OJJDP Statistical Briefing Book," Office of Juvenile Justice and Delinquency Prevention, May 2016, www.ojjdp.gov/ojstatbb/offenders/qa03105 .asp?qaDate=2014.

Consistent with these trends, the Supreme Court concluded in *Miller* that a life sentence is unconstitutional for all but the "rare juvenile offender whose crime reflects irreparable corruption." *Miller v. Alabama*, *supra*, 132 S. Ct. at 2469, quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005); see also *Montgomery v. Louisiana*, *supra*, 136 S. Ct. at 733–34. Yet in sentencing Kelly the trial judge said only one thing relating to his youth when he committed the murders: "The mitigating factors, as far as Mr. Kelly is concerned, is [the judge

meant "are"] the fact that he's 17 years old right now and [was] 16 years [old] at the time he committed this offense." So cursory a statement does not evidence the deliberate reflection on Kelly's character that would be necessary to conclude that he is "irretrievably depraved" and his "rehabilitation is impossible." *Roper v. Simmons*, *supra*, 543 U.S. at 570; *Montgomery v. Louisiana*, *supra*, 136 S. Ct. at 733. As far as the record reflects, Kelly is a typical youthful offender. We do not know the details of the fight that resulted in his shooting two people, but the judge found that the killings were not planned and were tragic for everyone involved, including Kelly. The judge mused that there "have always been disagreements among young people" and that what would have been a fist fight or a knife fight in years past, today has elevated consequences because of the ubiquity of guns; not the stuff of a crime demonstrating the complete depravity and irredeemability of Kelly.

We should allow him to pursue his *Miller* claim in the district court, which should conduct a hearing to determine whether he is or is not incorrigible.