

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 25S-PC-108

## McKinley Kelly,

*Appellant/Petitioner,*

—v—

## State of Indiana,

*Appellee/Respondent.*



FILED

Apr 30 2025, 11:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

Argued: November 6, 2024 | Decided: April 30, 2025

Appeal from the Lake Superior Court No. 3
No. 45G03-2002-PC-7
The Honorable Mark Watson, Magistrate
and the Honorable Gina Jones, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-PC-1025

---

**Opinion by Justice Molter**

Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**Molter, Justice.**

McKinley Kelly was still emerging from a childhood enmeshed in violence when a jury found that he brutally murdered three young adults. He was sixteen years old when he committed the murders and seventeen when he was sentenced. The judge, after vacating one of those convictions, sentenced him to 110 years in prison—fifty-five-year consecutive sentences for each offense. Kelly unsuccessfully appealed his convictions and sentence, pursued state court post-conviction relief, and sought habeas relief in federal court.

But the landscape of juvenile sentencing—even for the most heinous crimes like these—has since changed. So the Court of Appeals authorized Kelly to file a successive petition for post-conviction relief challenging his sentence. His claims focus on a deepening scientific understanding of adolescent brain function, which better explains why juveniles are less culpable and more capable of change. Those developments, he contends, should lead either to a resentencing—reconsidering his sentence in light of this better understanding—or to a more lenient sentence offering more hope for a meaningful period of life outside prison walls.

After permitting Kelly to amend his claims, the post-conviction court denied his petition, and when he appealed, the Court of Appeals affirmed. Today, we grant transfer to address important procedural issues for post-conviction relief and important substantive issues for juvenile sentencing. Like the Court of Appeals, we affirm the post-conviction court, and we reach three key conclusions along the way.

First, while the Indiana Rules of Post-Conviction Remedies ("Post-Conviction Rules") require appellate screening before *filing* a successive petition for post-conviction relief, those rules do not require appellate screening before *amending* a successive petition. So the post-conviction court's decision to permit Kelly to amend his claims was appropriate. Second, the state and federal constitutional provisions Kelly cites with various sentencing restrictions and requirements for equal treatment do not compel a more lenient sentence here. And third, Kelly's sentence is not inappropriate based on the nature of his offenses and his character.

We hasten to note, though, that in this procedural posture we are only reviewing Kelly's claims that our state and federal constitutions, along with our court rules, compelled more leniency when he was sentenced. That is different than reviewing a request for a statutorily authorized sentence *modification*, which involves considering an offender's personal, rehabilitative progress after sentencing. A key premise of Kelly's arguments is that "a court cannot reliably determine at the time of sentencing whether a child is irredeemable." Appellant's Br. at 42. That is true, but that mystery is just as much a reason *not* to shorten a sentence—after all, time may prove the child is irreparably corrupted.

Helpfully, the legislature addressed this dilemma recently by amending its sentence modification statute to offer juvenile offenders like Kelly a right to have their sentences reexamined after twenty years. Ind. Code § 35-38-1-17(n). At that point, the reviewing court will have the benefit of evidence related to Kelly's rehabilitative successes or failures. And all the constitutional provisions that guide sentencing and direct distinct treatment of juvenile offenders will continue to inform the reviewing courts' analysis and discretion.

## Facts and Procedural History

Violence enveloped McKinley Kelly's childhood. His father sometimes beat him, once by whipping him repeatedly with an extension cord and another time by beating him with a stick and kicking him in the head. Bullets came through the windows of his family home. When Kelly was fifteen, he was shot in the shoulder. And he witnessed the death of his best friend, who died in his arms after being shot. After enduring one tragedy after another, Kelly did not expect he would reach adulthood. Under these circumstances, it is unfortunate but unsurprising that Kelly ended up joining a gang.

While tragic, Kelly's circumstances do not excuse or justify what he did on the evening of January 8, 1996. Sixteen-year-old Kelly and three of his friends were driving around East Chicago and came upon Maurice Hobson, Karl Jackson, and Vincent Ray, who were standing in a driveway.

Armed with a revolver, Kelly got out of the car and confronted Jackson. Kelly initiated the confrontation, argued with Jackson, and then pulled out his gun and shot Jackson. After Jackson fell, Kelly stood over him and fired more shots into him.

Hobson asked Kelly why he had shot Jackson. In response, Kelly shot Hobson in the head and chest. One of Kelly's companions, Leo Dent, also shot Hobson with a shotgun. Kelly then left the scene, but Dent stayed behind to kill Ray.

Kelly was charged with murdering Jackson, Ray, and Hobson, and a jury found him guilty on all three counts. The trial court vacated Kelly's conviction for Ray's murder. The court then sentenced Kelly—who was seventeen at that point—to the presumptive term of fifty-five years for each murder, to run consecutively for an aggregate term of 110 years. The court imposed this sentence only after considering Kelly's young age as a mitigating factor.

On direct appeal, this Court affirmed, rejecting Kelly's arguments that there was insufficient evidence to support his convictions and that his sentence was manifestly unreasonable given his age and his brother's influence over his actions. *Kelly v. State*, 719 N.E.2d 391, 394, 395 (Ind. 1999). Kelly petitioned for post-conviction relief in 2001. The post-conviction court denied relief, and the Court of Appeals affirmed. He then petitioned for a writ of habeas corpus, which a federal district court denied.

In 2012, the United States Supreme Court decided *Miller v. Alabama*, in which it held that mandatory life without parole sentences for juveniles violate the Eighth Amendment. 567 U.S. 460, 479 (2012). Before a juvenile convicted of a homicide offense can be sentenced to life without parole ("LWOP"), a court must consider the defendant's age, since it is only "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479–80. While Kelly did not receive an LWOP sentence, he nonetheless applied to file a second petition for a writ of habeas corpus on the theory that he was serving a de facto life sentence in violation of *Miller*.

The Seventh Circuit accepted that Kelly was serving a de facto life sentence but dismissed his application, holding that the sentencing court considered Kelly's age before sentencing him, as *Miller* required. *Kelly v. Brown*, 851 F.3d 686, 687–88 (7th Cir. 2017). Judge Posner dissented, concluding that the trial court's consideration of Kelly's youth did not amount to finding Kelly was irreparably corrupt. *Id.* at 688–89 (Posner, J., dissenting). Judge Posner therefore would have allowed Kelly to pursue his habeas claim. *Id.*

In 2019, Kelly filed a pro se successive petition for post-conviction relief asserting that his sentence violated various provisions in the United States and Indiana Constitutions generally related to sentencing juvenile offenders. The Court of Appeals authorized his successive petition under Post-Conviction Rule 1(12)(b), and the State Public Defender accepted his case. She then amended his petition to add additional constitutional claims and to claim that new evidence related to adolescent brain development entitled him to resentencing.

At the evidentiary hearing on Kelly's petition, the State objected to some of the new grounds raised in the amended petition. But the post-conviction court allowed the new claims to proceed. In addition to legal arguments, Kelly presented evidence on research into juvenile brain development, which he argued demonstrates diminished culpability for juvenile offenders and greater capacity for reform. After hearing the evidence, the post-conviction court denied relief.

Kelly appealed, asking the Court of Appeals to reverse the post-conviction court's decision and to reconsider his sentence under Appellate Rule 7(B). The Court of Appeals unanimously held that the claims raised by amendment were waived, affirmed the denial of relief under the United States and Indiana Constitutions, and held that evidence about juvenile brain development was not newly discovered evidence under the Post-Conviction Rules. *Kelly v. State*, 236 N.E.3d 716, 724, 726, 728, 731–33 (Ind. Ct. App. 2024). Finally, the court concluded that claim preclusion barred it (but not this Court) from reconsidering Kelly's sentence under Appellate Rule 7(B). *Id.* at 735.

Kelly then petitioned for transfer to this Court, which we now grant, thus vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A).

## Standard of Review

Kelly appeals from a negative judgment, so he must show that "the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court." *Conley v. State*, 183 N.E.3d 276, 282 (Ind. 2022) (quoting *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001)). We do not reweigh the evidence presented at the post-conviction proceedings, and we examine only the evidence and reasonable inferences that support the post-conviction court's determination. *Id.* But we review pure legal questions de novo. *State v. Stidham*, 157 N.E.3d 1185, 1190 (Ind. 2020). This includes the interpretation of the Post-Conviction Rules. *See Howard v. State*, 653 N.E.2d 1389, 1390 (Ind. 1995).

## Discussion and Decision

The parties disagree over both the scope and merits of Kelly's claims. Below, we first explain that it was proper for the post-conviction court to consider Kelly's amendments to the claims in his successive petition for post-conviction relief. After that, we explain that none of Kelly's claims merit relief—the post-conviction court did not err in denying all the claims in his amended petition, and we decline to revise his sentence through our Appellate Rule 7(B) discretion.

## I.    Kelly's Amendments to His Successive Petition

The State makes a threshold argument that while Kelly properly obtained appellate court permission to file his successive petition for post-conviction relief, he waived his amended claims because he failed to submit those amendments for appellate screening. Kelly responds that the State misreads the Post-Conviction Rules, which only require appellate screening for *filing* successive petitions, not *amending* them. We agree with Kelly.

## A. Kelly's amended claims were an "outgrowth" of his claims in his proposed successive petition.

Kelly's proposed successive petition alleged that his "sentence of 110 years is materially indistinguishable from a life sentence without parole," and because he was a juvenile when he committed his offenses, that sentence violates: the United States Constitution's Sixth Amendment (right to a speedy and public trial with the assistance of counsel) and Eighth Amendment (ban on cruel and unusual punishments); Article 1, Section 16 of the Indiana Constitution (ban on cruel and unusual punishments and requirement that penalties be proportioned to the offense); and the United States Supreme Court's holdings in *Miller v. Alabama*, 567 U.S. 460 (2012) (holding that mandatory life imprisonment without parole violates the Eighth Amendment's ban on cruel and unusual punishments for those who committed their offenses before they were eighteen), *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016) (holding that *Miller* announced a new substantive constitutional rule that was retroactive on state collateral review), and *Tatum v. Arizona*, 580 U.S. 952 (2016) (remanding for reconsideration of juveniles' life without parole sentences in light of *Montgomery*). App. Vol. 2 at 51–52. He also claimed the appellate courts should exercise their discretion to revise his sentence under Appellate Rule 7(B) because his sentence is inappropriate based on the nature of his offenses and his character.

After the Court of Appeals permitted Kelly to file his successive petition based on its conclusion that he had a reasonable possibility of success, the State Public Defender entered her appearance and amended his petition to add a few more claims: advancements in developmental psychology and neuroscience reflecting that children are less culpable and more capable of change than adults is newly discovered sentencing evidence entitling Kelly to a new sentencing hearing; Kelly's sentence was unconstitutional under the Indiana Constitution's Article 1, Section 15 (protecting those the State detains from unnecessary rigor), Section 18 (requiring a penal code based on reformation rather than vindictive justice), and Section 23 (guaranteeing equal privileges and immunities to all); and Kelly's sentence violated the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution. She also dropped Kelly's Sixth Amendment claim.

The post-conviction court permitted those amendments because they were "very similar to" and an "an outgrowth" of the claims in Kelly's pro se petition that the Court of Appeals authorized. "[E]ach and every claim" in the amended petition, as the court saw it, "is still tying in with the overall theme raised by Mr. Kelly when he filed [his] pro se petition back before the state public defender was involved." Tr. at 9. By contrast, the court explained it may not have permitted the amendment if the State Public Defender asserted "stand-alone claims that were completely unrelated" to the claims in the petition that the Court of Appeals authorized. *Id.*

The State does not dispute that the amendment was substantively proper. That is, the State does not dispute that the amendment "merely repackages and expands upon the authorized claims," that "the evidence presented on [Kelly's] successive petition was not materially altered by the presentation of the additional claims," or that the Post-Conviction Rules permit those sorts of amendments to successive petitions. Pet. to Trans. at 8. Instead, the State argues the amendment was procedurally improper because it was the post-conviction court rather than the Court of Appeals that authorized the amendment.

We agree with Kelly that the Post-Conviction Rules empower post-conviction courts to permit amendments to successive petitions.

## B.  Post-conviction courts are empowered to permit amendments to successive petitions.

The primary route for seeking review of claimed errors leading to a criminal conviction or sentence is a direct appeal from a final judgment. *Pruitt v. State*, 903 N.E.2d 899, 905 (Ind. 2009). From there, the path narrows. If a direct appeal is inadequate, the convicted defendant may collaterally attack the judgment through post-conviction proceedings, which are civil proceedings governed by the Indiana Rules of Post-Conviction Remedies. *Gibson v. State*, 133 N.E.3d 673, 681 (Ind. 2019). But

"[p]ost-conviction proceedings are not a 'super-appeal'; rather, the grounds enumerated in the Post-Conviction Rules are limited to issues that were not known at the time of the original trial or that were not available on direct appeal." *Corcoran v. State*, 246 N.E.3d 782, 795 (Ind. 2024).

After the first petition for post-conviction relief, a party may file an additional petition—a "successive" petition—only if they first get permission from our appellate courts, which will authorize the filing only if the petitioner makes a threshold showing that there is a "'reasonable possibility'" that they are entitled to relief. *Shaw v. State*, 130 N.E.3d 91, 92 (Ind. 2019) (quoting Ind. Post-Conviction Rule 1(12)). Once an appellate court authorizes the petitioner to file a successive petition, the petitioner files the petition in the same court where the petitioner's first petition for post-conviction relief was resolved. P-C.R. 1(12)(c).

Kelly followed that procedure for a successive petition here. He submitted a proposed petition to the Court of Appeals; that court allowed him to file the petition after concluding he demonstrated a reasonable possibility he is entitled to relief; and then he filed the petition in the same court that adjudicated his first petition. The State does not challenge Kelly's compliance with that procedure for *filing* a successive petition.

But the State does challenge Kelly's *amendment* of his petition, arguing that the post-conviction court erred by allowing Kelly to amend his petition without first requiring Kelly to go back to the Court of Appeals to get permission to add the new claims. The State doesn't argue the rules forbid Kelly's amendment, only that the wrong court granted him permission. And Court of Appeals panels have split over the question of whether post-conviction courts may permit amendments to successive petitions, or whether the petitioner must instead first obtain leave from the Court of Appeals to amend the claims. *Compare Beech v. State*, 702 N.E.2d 1132, 1134 (Ind. Ct. App. 1998) (holding that the post-conviction court lacks jurisdiction over an amended petition when the petitioner does not first obtain leave from the Court of Appeals for the amendment), *and Burkett v. State*, 195 N.E.3d 394, 397 (Ind. Ct. App. 2022) (holding that post-conviction courts cannot consider claims added by amendment if the

petitioner did not first obtain leave to amend from the Court of Appeals), *with Washington v. State*, No. 71A03-0603-PC-103, 2007 WL 4170755 at *5 (Ind. Ct. App. Nov. 27, 2007) (mem.) (rejecting the State's argument that the post-conviction court erred in considering the amended petition where the petitioner did not obtain leave from the Court of Appeals to amend the petition).

The State argues that "the post-conviction rules' plain language" assigns the Court of Appeals the task of deciding whether a petitioner can amend a successive petition. Resp. to Trans. at 7. But the State doesn't point to any language saying that. The closest it comes is citing the language requiring the Court of Appeals to "authorize the *filing* of the petition if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief." P-C.R. 1(12)(b) (emphasis added). But relying on that language is circular. The State is just assuming that the responsibility to screen the *filing* of successive petitions also includes the responsibility to screen all subsequent *amendments*, which is just rephrasing the question presented as its own answer.

The plain language in the rules instead suggests Kelly is correct that it is for the post-conviction court, not the Court of Appeals, to decide in the first instance whether a petitioner's amendment is proper. The rules for amending petitions don't distinguish between initial and successive petitions, and they say the post-conviction court "may make appropriate orders for amendment of the petition." P-C.R. 1(4)(a); *see also* P-C.R. 1(4)(c) (authorizing the amendment of petitions). And when, as here, the State Public Defender appears after the petition was filed, she must "confer with petitioner and ascertain all grounds for relief . . . , amending the petition if necessary to include any grounds not included by petitioner in the original petition." P-C.R. 1(9)(c). Again, there is no distinction noted for initial and successive petitions. Because Kelly points to language in the rules empowering post-conviction courts to permit proper amendments, and the State does not point to any language requiring permission from the Court of Appeals to amend (as opposed to file) successive petitions, we conclude Kelly offers the better reading of the rules.

The State worries our interpretation of the Post-Conviction Rules will "generate interlocutory appeals of rulings authorizing or denying new claims." Resp. to Trans. at 7. That is true enough, but that further illustrates that Kelly's interpretation enhances rather than undermines judicial efficiency. Interlocutory review would be discretionary, only permitted if *both* the post-conviction court and the Court of Appeals conclude that would be the most efficient way to proceed. Ind. Appellate Rule 14(B).

In contrast, under the State's proposed approach, appellate screening for all amendments would be required even when, as here, that would be the least efficient approach. Since the State does not dispute Kelly's amendments were proper, time would have been lost, and nothing gained, by returning to the Court of Appeals for appellate screening.

Having the post-conviction court screen amendments will often be more efficient than appellate screening because a post-conviction court will often be more familiar with the matter. The successive petition will already be before the court, and it will be the same court that handled the first petition and the underlying criminal case. P-C.R. 1(2), 1(12)(c). If instead the successive petition must return to the Court of Appeals to screen amendments, the rotating appellate motions panel screening the amendments will likely be a different panel than the panel that screened the successive petition.

The State's proposed approach is also out of sync with the Court of Appeals' current screening practices, at least as reflected in this case. Here, the motions panel did not screen Kelly's proposed successive petition claim-by-claim. Instead, the panel issued a short, boilerplate order with a single sentence of analysis for the petition as a whole, stating: "Petitioner has established a reasonable possibility that he is entitled to post-conviction relief, and accordingly, the Court authorizes the filing of the petition." Order, *Kelly v. State*, No. 19A-SP-3095 (Ind. Ct. App. Jan. 31, 2020). Reflecting this wholesale rather than surgical claim-by-claim treatment, the court authorized the petition in its entirety even though the Sixth Amendment claim was so weak that Kelly immediately dropped it once he had the assistance of counsel.

We don't criticize that Court of Appeals' practice of authorizing petitions in their entirety, nor do we suggest the Court of Appeals can't undertake claim-by-claim screening before authorizing a successive petition. But we do not see any good reason to require that amendments receive claim-specific appellate preapproval when there is no such claim-specific requirement or practice for the underlying successive petition.

Because the Post-Conviction Rules do not say the Court of Appeals screens amendments to the successive petitions it has authorized, we conclude the post-conviction court was correct that the rules vested it rather than the Court of Appeals with responsibility for overseeing amendments. And because the State's only complaint is about *who* authorized the amendment and not *whether* the amendment was proper, we review the merits of all Kelly's amended claims.

## II.   Kelly's Claims

All of Kelly's legal arguments rest on a foundational understanding that children are less culpable and more capable of change than adults, so we generally should not sentence children to a life of incarceration even when they commit the most heinous crimes. Those arguments all emphasize two facts.

First, Kelly contends that, practically speaking, he has been sentenced to life in prison. He was sentenced to incarceration for 110 years, meaning the earliest he can be released (assuming a reduction in time for good behavior) is when he will be sixty-nine years old, which he argues is beyond his life expectancy.

Second, advancements in developmental psychology and neuroscience after Kelly was sentenced better explain why children are less culpable and more capable of change than adults. In short, Kelly describes the scientific understanding—gleaned in part from brain imaging scans—that the portions of children's brains responsible for impulse control, emotional regulation, and executive function (the prefrontal cortex) lag in development behind the portions responsible for processing emotional responses to incentives and rewards (the limbic system). This leads to

"sensation-seeking and risky behavior" because children's brains "focus more heavily on the benefits of risky behavior than on the potential negative consequences." Appellant's Br. at 24–25. And that is exacerbated by the sort of childhood trauma that Kelly experienced. On the other hand, children have greater capacity for rehabilitation "because an adolescent brain can mature and change more than an adult brain." *Id.* at 25.

This sharpening scientific understanding has contributed to a few key developments in how we apply our state and federal constitutions to juvenile sentencing since Kelly was sentenced: now juvenile offenders cannot be sentenced to death (*Roper v. Simmons*, 543 U.S. 551 (2005)); they cannot be sentenced to life without parole for crimes other than homicide (*Graham v. Florida*, 560 U.S. 48 (2010)); life sentences cannot be mandatory for juveniles (*Miller v. Alabama*, 567 U.S. 460 (2012)); and life without parole sentences must be reserved for only the rare juveniles who are irreparably corrupt (*Montgomery v. Louisiana*, 577 U.S. 190 (2016)).

With all this in mind, Kelly argues we should reach one of three conclusions. First, we should conclude Kelly needs to be resentenced so the sentencing judge will have the benefit of these latest scientific and legal developments. If we don't order a resentencing, then Kelly urges us to conclude that various state and federal constitutional provisions compel us to reduce his sentence to a length that still "provides him with hope for a meaningful life outside prison walls." Appellant's Br. at 70. And if we conclude there is no constitutional command to do that, then we should reduce his sentence through our Appellate Rule 7(B) discretion to revise sentences we find inappropriate based on the nature of the offense and the character of the offender.

The State argues Kelly is not entitled to any relief. It doesn't dispute the scientific understanding that Kelly describes, but it argues that understanding isn't new, and the sentencing judge already factored Kelly's youth into the sentence. The State also argues Kelly's sentence doesn't violate the state or federal constitutions, and neither the nature of the offenses nor Kelly's character warrant revising his sentence.

We mostly agree with the State, and we conclude Kelly is not entitled to any relief through his successive petition.

## A.  Newly Discovered Evidence

One basis for relief under our Post-Conviction Rules is that "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Ind. Post-Conviction Rule 1(1)(a)(4). Finality of judgments is critical to our judicial system though, so claims of new evidence are "carefully scrutinized" and accepted only with "great caution." *Taylor v. State*, 840 N.E.2d 324, 330 (Ind. 2006). Thus, new evidence warranting relief under this provision must satisfy each of nine elements:

> (1) that the evidence has been discovered since the trial [or sentencing]; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case [or resentencing]; and (9) that it will probably produce a different result.

*State v. Brunner*, 947 N.E.2d 411, 414 (Ind. 2011).

At his post-conviction hearing, Kelly introduced the testimony of Dr. Daniel Keating—a University of Michigan professor of psychology, psychiatry, and pediatrics—to establish that "[s]ince McKinley's 1996 sentencing, advancements in neuroscientific and psychological research have uncovered widely accepted evidence that juvenile and adult brains are fundamentally different," establishing that "children are less culpable and more capable of change." Appellant's Br. at 23. Kelly also introduced the testimony of Dr. Jack Bloom, a professor of sociology, history, and minority studies at Indiana University Northwest, who testified about Kelly's difficult upbringing, the impact that had on his outlook, and some of Kelly's changes as he has grown.

But the sentencing court already relied on Kelly's youth as a mitigating factor when imposing the presumptive sentence of fifty-five years for each count rather than the maximum sixty-five-year sentence even though that court found several aggravating circumstances. So the post-conviction court concluded Kelly failed to satisfy his burden to show (a) this evidence wasn't cumulative of the youth-related evidence the sentencing court already considered, and (b) this evidence would have probably produced a different sentence.

Kelly argues the post-conviction court was mistaken because this new evidence would have "contextualized the importance of youth and its impact on McKinley's culpability and changeability," and the evidence probably would have dissuaded the sentencing court from its views that "youth violence was a worsening problem and that McKinley's actions demonstrated a lack of respect for human life that made him more likely to reoffend." Appellant's Br. at 34, 35. But as the State points out, while much of the research Kelly points to is new, the material conclusions the research supports are not. Evidencing that, fourteen years before Kelly's sentencing the United States Supreme Court, echoing Kelly's argument here, explained:

> Adolescents everywhere, from every walk of life, are often dangerous to themselves and to others. Adolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth.

*Eddings v. Oklahoma*, 455 U.S. 104, 115 n.11 (1982) (brackets, quotations, and citations omitted).

While it is possible Kelly's new evidence could make a difference through resentencing, that is not enough for post-conviction relief. Kelly had to show it is probable the new evidence would produce a different outcome. We cannot say the post-conviction court, after exercising the scrutiny and caution we require, clearly erred in concluding Kelly's evidence was cumulative and probably inconsequential given the sentencing court's consideration of Kelly's age when imposing an advisory sentence. *Taylor*, 840 N.E.2d at 329–30; *see also Conley v. State*, 183 N.E.3d 276, 284 (Ind. 2022) ("Because the trial court did thoughtfully consider Conley's age, did find it to be mitigating, and explained in great detail why it gave this factor only some weight, we do not find a reasonable probability that the outcome would have been different had counsel presented additional evidence about juvenile brain development."). And we decline Kelly's invitation to reweigh this evidence, which our appellate standard of review does not permit. *Conley*, 183 N.E.3d at 282.

Since we decline to order that Kelly be resentenced, he asks that we recognize a constitutional command to reduce his sentence ourselves, which we consider next.

## B.     Constitutional Claims

Kelly argues that both the state and federal constitutions compel a sentence reduction based on his youth when he committed his offenses. "Because we only need to reach the federal constitutional analysis if the Indiana Constitution does not resolve the claim, we begin with" Kelly's state constitutional law claims. *State v. Katz*, 179 N.E.3d 431, 442 (Ind. 2022). After concluding that there is no relief under the state constitution, we turn to the federal constitution, which we conclude offers no relief either.

### 1.     Indiana Constitution

Kelly argues that the Indiana Constitution's prohibitions on punishments that are either cruel and unusual, disproportionate to the

offense, vindictive rather than reformative, or unnecessarily rigorous compel a sentence reduction. If not, then he argues the constitutional requirement to treat similarly situated people similarly renders his sentence invalid because he did not receive the same procedural protections as those who are sentenced to life without parole even though, he argues, his lengthy term-of-years sentence has the same practical consequence for him. Each of these arguments falls short.

### a. Article 1, Section 16

Article 1, Section 16 of the Indiana Constitution imposes two sentencing limitations relevant here.

First, it prohibits "[c]ruel and unusual punishments," Ind. Const. art. 1, § 16, which are sentences that "make[] no measurable contribution to acceptable goals of punishment, but rather constitute[] only purposeless and needless imposition of pain and suffering." *Dunlop v. State*, 724 N.E.2d 592, 597 (Ind. 2000) (quotations omitted). Examples include horrific punishments "inflicted at the whipping post, in the pillory, burning at the stake, breaking on the wheel, etc." *Hobbs v. State*, 32 N.E. 1019, 1021 (Ind. 1893).

Kelly argues his sentence is a de facto life without parole sentence, which is cruel and unusual for a juvenile given their diminished culpability and greater ability to change unless there is a finding that they are beyond rehabilitation. But that argument fails because the cruel-and-unusual clause "is aimed at the kind and form of the punishment, rather than the duration or amount," and therefore a "sentence of life imprisonment without parole does not constitute cruel and unusual punishment." *Dunlop*, 724 N.E.2d at 597; *see also Conley v. State*, 972 N.E.2d 864, 880 (Ind. 2012) (holding that a life-without-parole sentence was not cruel and unusual even though Conley was "only the fourth juvenile sentenced to a life-without-parole sentence").

Even if a life without parole sentence could constitute cruel and unusual punishment, that isn't Kelly's sentence; he was sentenced to a term of years. He argues this is a distinction without a difference because

the earliest he could be released would be just shy of his seventieth birthday, which is beyond his life expectancy. But we rejected that exact argument just a few years ago in *Wilson v. State* because deciding which sentences are de facto life without parole sentences would require imprecise line-drawing, and basing a distinction on life expectancy implicates other constitutional concerns because life expectancy can differ based on immutable characteristics. 157 N.E.3d 1163, 1175–76, n.8 (Ind. 2020).

Second, Section 16 requires "[a]ll penalties shall be proportioned to the nature of the offense." Ind. Const. art. 1, § 16. Kelly does not argue that the length of his sentence is generally disproportionate for two murder offenses. But even if a statutory sentence is generally valid, it may be unconstitutional as applied to a particular defendant if the sentence is "entirely out of proportion to the gravity of the offenses actually committed as to shock public sentiment and violate the judgment of a reasonable people." *Clark v. State*, 561 N.E.2d 759, 765 (Ind. 1990) (quotation omitted). For example, in *Clark*, we held that a decades-long sentence for operating a vehicle while intoxicated was not proportionate to the nature of the offense when there were no injuries or property damage. *Id.* at 766. We reached a similar result in *Best v. State*, 566 N.E.2d 1027, 1032 (Ind. 1991), also stressing the circumstances of the offense.

Kelly argues his lengthy sentence is disproportionate because juveniles have diminished culpability and greater ability for reform than adult offenders, so a juvenile sentence should be less than an adult's sentence for the same offense. Yet a lifetime in prison is a harsher sentence for a juvenile than an adult because the remainder of a juvenile's life is longer.

In the abstract, there is plenty of Kelly's argument with which we agree. Our juvenile and criminal codes recognize that offenses committed by juveniles are different in nature than those committed by adults. That is why a juvenile who commits a misdemeanor or felony generally commits a "delinquent act" and is a "delinquent child" rather than a criminal. I.C. §§ 31-37-1-1, -1-2. Even though a delinquent child's conduct is the same as a criminal's conduct, the nature of the child's offense is different, so they (generally) benefit from a parallel and more lenient

justice system with differing tools for reform. *See In re K.G.*, 808 N.E.2d 631, 637 (Ind. 2004).

To be sure, we treat murder as a crime rather than a delinquent act when committed by someone at least sixteen years old. I.C. §§ 31-37-1-2, 31-30-1-4(b). But the considerations that typically lead us to treat the behavior of children differently—"their distinctive (and transitory) mental traits and environmental vulnerabilities"—are not "crime-specific." *Miller*, 567 U.S. at 473. And even for juveniles at least sixteen years old who commit murder, we have explained that "at initial sentencing and on appellate review it is necessary to consider an offender's youth and its attendant characteristics." *Brown v. State*, 10 N.E.3d 1, 6–7 (Ind. 2014); *see also Conley*, 183 N.E.3d at 284 (recognizing that even for juveniles at least sixteen years old who commit murder, we have recognized they generally "have diminished culpability and greater prospects for reform"). Thus, when "examining whether a given punishment is proportionate to the crime," "[t]here is no reason why an offender's juvenile status should be excluded from the analysis." *Graham*, 560 U.S. at 90 (Roberts, C.J., concurring in the judgment).

One of Kelly's other points undercuts his argument though. He correctly observes that the transient nature of youth means "it is not possible to accurately determine when sentencing a child whether he is capable of rehabilitation." Appellant's Br. at 46. But that uncertainty is no more of a reason to conclude a child is capable of rehabilitation than it is to conclude they are not. After all, we have recognized that "even considering the notable differences between juveniles and adults," sometimes "the juvenile's crimes are so reprehensible and heinous that an LWOP sentence would be appropriate." *Conley*, 183 N.E.3d at 284. Thus, Kelly acknowledges that all the State needs to provide is a "meaningful opportunity for release based on demonstrated maturity and rehabilitation." Appellant's Br. at 47.

Our legislature has provided just that. It has designed a sentencing regime where (1) a sentencing judge initially takes a juvenile's youth into account when fashioning a sentence (as the judge did here); (2) then a juvenile offender has the same right as an adult to seek a sentence

modification based on their progress towards rehabilitation, though this requires the permission of the prosecuting attorney if it has been more than a year since sentencing; and (3) then juvenile offenders like Kelly have an additional opportunity for sentence modification that is not available to those who were adults when they committed their offense. I.C. §§ 35-38-1-7.1(c); 35-38-1-17(k), (n). For murder, youthful offenders like Kelly can have their sentence reexamined after twenty years when courts have a better opportunity to assess whether the individual has been rehabilitated, or is on that path. I.C. § 35-38-1-17(n)(2). Unlike with adult offenders, there is no requirement to obtain the prosecutor's consent for this review.

Courts considering these sentence modification petitions have the benefit of a "report from the department of correction concerning the convicted person's conduct while imprisoned." I.C. § 35-38-1-17(e)(2). And the reviewing court will continue to be guided by the sentencing-related constitutional provisions, including those requiring distinct treatment of juvenile offenders. This gives a petitioner a chance to show the court that their immaturity at the time of the crime was truly transient and that they are not irreparably corrupt. The court reviewing the petition will be in a better position to evaluate the petitioner's capacity for reform than the court at the initial sentencing.

Thus, the legislature constructed precisely the sort of sentencing framework Kelly says the constitution demands, which is one with built-in flexibility to recognize the distinct nature of offenses that children commit and to both assess and then later reassess their capacity for reform. Especially for an issue like this, where Kelly's argument focuses on evolving understandings—an evolving scientific understanding and an evolving understanding of Kelly's personal development—prudence cautions towards relying on the legislature's more flexible solution vindicating our Constitution's commands rather than resorting to a more calcified court-crafted rule. *See In re Adoption of P.J.W.*, 248 N.E.3d 574, 579 n.3 (Ind. 2025) (explaining that "we generally avoid addressing constitutional questions if a case can be resolved on other grounds").

## b.    Article 1, Section 18

Article 1, Section 18 states, "[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice." Ind. Const. art. 1, § 18. Since our State's founding, this concern has been especially acute for juvenile offenders.

During the debates leading to the 1851 Constitution, juvenile offenders were the subject of an impassioned speech by delegate James Bryant. He stressed that the goal of punishment "is two-fold: the prevention of crime and the reformation of the offender," and he argued that sending children to prison would not serve these goals because often they are "the victims of dissolute parents and neglected education." *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 1903 (1850). Mr. Bryant made these remarks in support of amending the language of what became Article 9, Section 2 so that the General Assembly would have to provide separate reformatory institutions for juvenile offenders rather than housing them with adult offenders. *Id.*

Section 18's requirement applies to Indiana's criminal code generally, and we have repeatedly held that individual, fact-specific challenges of the penal code's applications are not reviewable under Article 1, Section 18. *Ratliff v. Cohn*, 693 N.E.2d 530, 542 (Ind. 1998); *Lowery v. State*, 478 N.E.2d 1214, 1220 (Ind. 1985). Kelly argues that the blanket application of Indiana's penal code to juvenile offenders at sentencing violates Article 1, Section 18 because it "fails to consider the unique characteristics of children . . . when imposing adult penalties on them." Appellant's Br. at 50.

But this ignores the discretion our trial courts exercise in sentencing when they consider an offender's youth as a mitigating factor. It also ignores that Kelly can seek a modification of his sentence under Indiana Code section 35-38-1-17. Since the court that decides whether to modify a juvenile's sentence will be able to see the extent of the offender's success towards the rehabilitative goal, the penal code continues to ensure that juveniles' unique characteristics are taken into account before their sentences are fully served. Indiana's sentencing statutes, including its

sentence modification statutes, ensure that rehabilitation—not vindictiveness—is the core of juvenile sentencing in Indiana.

### c.    Article 1, Section 15

Article 1, Section 15 of the Indiana Constitution provides, "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor." Ind. Const. art. 1, § 15. This provision is typically invoked when a prisoner suffers severe mistreatment, like being beaten or tortured. *See, e.g., Roberts v. State*, 307 N.E.2d 501, 506 (Ind. Ct. App. 1974); *Kokenes v. State*, 13 N.E.2d 524, 530 (Ind. 1938); *Bonahoon v. State*, 178 N.E. 570, 571 (Ind. 1931). And we have specifically declined to interpret Article 1, Section 15 as prohibiting anything more than physical abuse. *Moore v. State*, 771 N.E.2d 46, 55 (Ind. 2002) ("[T]he length of time a person has spent on death row does not render his execution unconstitutional under the federal or state constitution."); *Ratliff*, 693 N.E.2d at 541.

Kelly acknowledges precedent holding that Article 1, Section 15 only prohibits physical abuse, but asks us to reconsider this interpretation. He argues that imposing a long term-of-years sentence on a juvenile offender constitutes "unnecessary rigor" under the plain meaning of those words. We disagree. "Article [1], § 15 is not a catch-all provision applicable to every adverse condition accompanying confinement." *McQueen v. State*, 711 N.E.2d 503, 505 (Ind. 1999). Even an extremely long sentence cannot constitute unnecessary rigor. *See id.*; *Moore*, 771 N.E.2d at 55. The length of a sentence may be unconstitutional because it is disproportionate to the nature of the offense, but that is a claim under Article 1, Section 16, not Section 15.

### d.    Article 1, Section 23

Kelly also argues that Indiana Code section 35-50-2-9 (the LWOP statute) grants unequal privileges, violating Article 1, Section 23 of the Indiana Constitution. That section provides, "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." Ind.

Const. art. 1, § 23. A statute creating disparate treatment does not violate Section 23 if two conditions are met:

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.

*Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 198 (Ind. 2016) (quotation omitted).

The LWOP statute provides procedural protections for defendants when the State seeks a sentence of life without parole. For example, the State must prove statutorily prescribed sentencing aggravators beyond a reasonable doubt, and where a jury convicts the defendant, the defendant is entitled to have the jury reconvene for the sentencing. I.C. § 35-50-2-9(a), (d). Kelly argues his case reflects that the statute produces two classes of offenders: (1) those, like him, "who are eligible for [an] LWOP sentence but are not charged under" the LWOP statute, so they do not receive the statute's protections; and (2) "those who are eligible for [an] LWOP sentence and are" charged under the LWOP statute, so they do receive the statutory protections. Appellant's Br. at 54.

We agree with the State that the disparate treatment is reasonably related to the inherent characteristics distinguishing the classes. Simply put, an LWOP sentence is lengthier than Kelly's sentence because Kelly's sentence allows for Kelly's eventual release. And we cannot say it is unreasonable for the legislature to provide heightened statutory protections for heightened sentences. It makes no difference that Kelly was *eligible* for an LWOP sentence since that is not the sentence he received.

## 2.    Federal Constitutional Claims

Having concluded that Kelly's state constitutional law claims fail, we turn to his federal claims.

## a.    Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. And to determine what constitutes a cruel and unusual punishment under the federal constitution, "courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Wilson*, 157 N.E.3d at 1170 (quoting *Graham v. Florida*, 560 U.S. 48, 58 (2010)).

Those standards reflect that we sentence juveniles differently than we sentence adults because children are inherently different than adults. *Miller*, 567 U.S. at 465. As we've recognized when applying our state constitution, juvenile crimes often "reflect[] unfortunate yet transient immaturity," even for heinous crimes like murder. *Id.* at 479 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)). So the federal constitution restricts courts to sentencing juvenile homicide offenders to life without parole only after considering the "offender's youth and attendant characteristics." *Id.* at 483. And a life without parole sentence is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479–80.

At the same time, a sentencing court does not have to make any finding that a juvenile offender is irreparably corrupt before imposing life without parole; as long as there are procedures in place for the consideration of an offender's age, a life without parole sentence is not unconstitutional. *Montgomery*, 577 U.S. at 211; *Jones v. Mississippi*, 593 U.S. 98, 105 (2021) ("In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.").

Kelly argues that his 110-year sentence violates these Eighth Amendment protections, but we disagree for two reasons. First, as we explained above, Kelly was sentenced to a term of years, not life without parole. *Supra*, Section II.B.1.a. Second, even if *Miller* did apply, its requirements were satisfied here because Indiana has procedures in place to ensure that only "the rare juvenile offender" is sentenced to die behind bars. *See Jones*, 593 U.S. at 108. The trial court considered Kelly's age before

imposing the term-of-years sentence. And the legislature has afforded him a statutory right to seek a sentence modification to a reduced or suspended sentence after he has served twenty years. I.C. § 35-38-1-17(n)(2).

## b.     Fourteenth Amendment

Kelly next argues that sentencing him without the LWOP statutory protections violated the Fourteenth Amendment's Equal Protection clause, which prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. That clause protects against "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Kelly contends his sentence is equivalent to life without parole, so equal protection entitled him to the LWOP statute's protections. He concedes that to prevail on his claim he must show there is no rational basis for providing the statutory protections to those sentenced to LWOP but not to him. Statutes are not struck down on rational basis review "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000).

Kelly's argument fails because he is not similarly situated to defendants the State charges under the LWOP statute—he received a more lenient sentence. Defendants sentenced after the State successfully prosecutes them under the LWOP statute will die in prison, while Kelly's sentence leaves open the possibility that he will be released from prison before he is seventy years old. *See Stewart v. State*, 945 N.E.2d 1277, 1288–89 (Ind. Ct. App. 2011) (rejecting the same equal protection argument because the term-of-years sentence did not foreclose the possibility of parole), *trans. denied*. He does not explain why treating these groups differently lacks any rational basis, nor does he point to any cases reaching that conclusion.

Having concluded that all of Kelly's constitutional arguments fail, we turn to his final argument, which is that our Court should exercise its discretion to revise his sentence.

## III.  Appellate Rule 7(B)

Our Court has the constitutional authority to "review and revise" sentences, Ind. Const. art. 7, § 4, but we held in Kelly's direct appeal that his sentence did not warrant revision. *Kelly v. State*, 719 N.E.2d 391, 395 (Ind. 1999). Kelly asks us to reconsider that decision.

Normally, claim preclusion would bar this request. "As a general rule, when a reviewing court decides an issue on direct appeal, the doctrine of res judicata applies, thereby precluding its review in post-conviction proceedings." *State v. Stidham*, 157 N.E.3d 1185, 1191 (Ind. 2020). There is an exception for a court to review its own decisions, but we generally only apply that exception in "extraordinary circumstances such as where the initial decision was clearly erroneous and would work manifest injustice." *Id.* Here, as in *Stidham*, Kelly first appealed his sentence prior to "two major shifts in the law": when we changed the standard by which we exercise our authority under Article 7, Section 4 of the Indiana Constitution to review and revise sentences; and when the United States Supreme Court began imposing limits on when juveniles could be sentenced to the harshest punishments. *Id.* at 1192–93. Given these circumstances—and the fact that the State has not invoked res judicata as a reason precluding our review—we address the merits of Kelly's Rule 7(B) claim.

Indiana Appellate Rule 7(B) allows this Court to revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). Our principal role in reviewing a sentence is to "leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Put another way, Rule 7(B) review allows us to "work toward a goal of similar sentences for perpetrators committing the same acts who have the same backgrounds." *Lane v. State*, 232 N.E.3d 119, 123 (Ind. 2024) (quotations omitted).

We first evaluate the nature of Kelly's offenses. "In considering the nature of the offense we recognize the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014). Kelly's fifty-five-year sentence for each murder count was then the "presumptive" sentence and now the "advisory" sentence, reflecting the midpoint of the sentencing range between a minimum of forty-five years and a maximum of sixty-five years. *Kelly*, 719 N.E.2d at 395 ("At the time Defendant committed these crimes, Murder carried a presumptive 55 year sentence, with not more than ten years added for aggravating circumstances and not more than ten years subtracted for mitigating circumstances."); I.C. § 35-50-2-3(a) ("A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years.").

Nothing about the circumstances of Kelly's offenses suggests that the presumptive sentence he received was inappropriate. He initiated the confrontation that ended in his two victims' deaths. *Kelly*, 719 N.E.2d at 393. He continued firing into Jackson after Jackson collapsed. *Id.* And he killed Hobson for seemingly no reason besides the fact that Hobson asked why Kelly had killed Jackson. *Id.* Kelly's crimes, like all murders, were "senseless and reprehensible," *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014), and his crimes were far from those "accompanied by restraint, regard, and lack of brutality," so the nature of his offenses was consistent with a presumptive sentence, *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

Kelly's character, particularly the fact that it was still developing given his age at the time of the offenses, is the most significant factor in this case. As noted throughout this opinion, juvenile offenders are less culpable and more capable of rehabilitation. That is why we have reduced the sentences of juvenile offenders through Rule 7(B) review more often than for other offenders. Most often, we are moved to reduce these sentences because otherwise the juvenile offender would be in prison for the rest of their life, which is normally not appropriate given juveniles' diminished culpability and capacity for rehabilitation. *See Brown*, 10 N.E.3d at 8 (revising an aggregate 150-year sentence for two murders to an aggregate 80-year sentence); *Fuller*, 9 N.E.3d at 659 (revising an aggregate 150-year sentence

for two murders and a robbery to an aggregate sentence of 85 years); *Wilson v. State*, 157 N.E.3d 1163, 1183–84 (Ind. 2020) (revising an aggregate 181-year sentence for two murders, armed robbery, and a gang enhancement to 100 years). Kelly's age at the time of his offenses is comparable to the juvenile offenders in *Brown*, *Fuller*, *Wilson*, and similar cases, but his sentence is substantially shorter than their sentences were before they were revised. Kelly's 110-year sentence is similar to Wilson's revised 100-year sentence, and Kelly will be sixty-nine years old on his earliest possible release date. *Supra*, Section II. We observed in *Wilson* that release in one's mid-to-late sixties provides a "reasonable hope for a life outside prison." 157 N.E.3d at 1184.

Kelly's sentence gives him that hope, which aligns with how we have treated other juvenile offenders. His sentence is therefore appropriate considering the nature of his offenses and his character, and we decline to revise it.

# Conclusion

For these reasons, we affirm the post-conviction court's judgment, and we deny Kelly's request that we revise his sentence under Appellate Rule 7(B).

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
Amy E. Karozos
Public Defender of Indiana

Katherine Province
Joanna Green
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana